LITTLE EARTH OF UNITED TRIBES, INC., et al., Plaintiffs,

v.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., Defendants.

Samuel R. PIERCE, Jr., Secretary of Housing and Urban Development, Counterclaimant,

v.

SOUTH HIGH NON–PROFIT HOUSING CORP., a/k/a Little Earth of United Tribes, Inc., Counterclaim-defendant.

Civ. No. 3–82–1096.

United States District Court, D. Minnesota, Third Division.

Oct. 19, 1987.

Larry B. Levanthal, Larry Levanthal & Associates, Bruce M. Badenoch, Legal Aid Society of Minneapolis, Randall Smith, Poindexter, Jacobson, Stromme & Harwood, Minneapolis, Minn., for plaintiffs.

Francis X. Hermann, Asst. U.S. Atty., Minneapolis, Minn., Sarah E. Canzoneri and Geoffrey L. Patton, U.S. Dept. of Housing and Urban Development, Washington, D.C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW ORDER FOR JUDGMENT AND MEMORANDUM

RENNER, District Judge.

The above entitled matter came on for trial before the undersigned, without a jury, on the 26th day of January, 1987 and continued through February 13, 1987. Final arguments were presented to the Court on March 25, 1987.

### PROCEDURAL BACKGROUND

On August 13, 1982, plaintiffs filed a complaint and motion for preliminary injunction seeking to prevent the U.S. De-

partment of Housing and Urban Development ("HUD") from foreclosing the mortgage on the Little Earth Housing Project. The parties thereafter stipulated to the entry of a preliminary injunction enjoining the scheduled foreclosure sale. The injunction was subsequently extended by the Court upon further agreement of the parties.

On May 11, 1983, the Court heard the federal defendants' motions for summary judgment and for appointment of a receiver, as well as plaintiffs' cross-motions for partial summary judgment and declaratory and injunctive relief. The complaint then at issue contained numerous allegations. For ease of discussion, the Court characterized these as "administrative action claims," and "civil rights claims." By Order dated June 27, 1983, the Court granted defendants summary judgment on the administrative action claims and took the civil rights claims under advisement pending further review. *Little Earth of United Tribes v. U.S. Dept. of HUD*, 584 F.Supp. 1287, 1292 (D.Minn.1983). Plaintiffs' motions for partial summary judgment and injunctive relief were denied as moot.

On August 4, 1983, plaintiffs appealed this Court's Order of June 27, 1983 to the Eighth Circuit Court of Appeals. On July 5, 1984, the Eighth Circuit dismissed the appeal on grounds that the June 27 Order was improperly certified as a final order under Rule 54(b). 738 F.2d 310 (8th Cir. 1984). Without commenting on the merits of plaintiffs' appeal, the Circuit Court suggested that this Court supplement the trial record by making a determination as to whether, assuming reviewability, HUD's denial of rent increases and flexible subsidy funds was proper. The Court has hereinafter done so.

On August 15, 1983, the Court addressed defendants' request for summary judgment as to plaintiffs' civil rights claims. The Court granted defendants summary judgment as to plaintiffs' claims for money damages, and claims under 42 U.S.C. § 1983. However, the Court denied summary judgment with respect to the remaining civil rights claims which allege viola-

tions of the Fifth Amendment; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 *et seq.;* and 42 U.S.C. §§ 1981, 1982 and 1985(3). *Little Earth of United Tribes v. U.S. Dept. of HUD*, 584 F.Supp. 1292, 1300–01 (D.Minn. 1983).

Subsequently, by Order dated August 19, 1983, the Court granted plaintiffs' motion for a preliminary injunction restraining a foreclosure sale pending resolution of the remaining civil rights claims. The Court also granted defendants' motion for appointment of a receiver *pendente lite*. *Little Earth of United Tribes v. U.S. Dept. of HUD*, 584 F.Supp. 1301, 1305 (D.Minn. 1983).

On March 26, 1984, plaintiffs filed a Supplemental Complaint dealing with HUD's late 1983 rejection of a proposed work-out agreement involving a Transfer of the Physical Assets ("TPA") of the Little Earth project to private entities. The Supplemental Complaint alleges that HUD's rejection of the proposed TPA violated plaintiffs' civil rights and was a "breach of trust and quasi-contract." Supplemental Complaint at paragraph 9.

On June 4, 1984, the defendants amended their answer to include a counterclaim for judicial foreclosure. In their initial reply to the counterclaim, plaintiffs raised a claim for setoff based on HUD's alleged breach of the interest reduction contract.

Subsequently, on September 22, 1986, plaintiffs amended their reply dropping the claim for setoff and adding three recoupment claims. Two of these claims, respectively alleging breach of the interest reduction contract and improper denial of flexible subsidy funding, were dismissed by the Court by summary judgment on January 14, 1987. The third claim, alleging breach of the project's Section 8 contract was dismissed on January 26, 1987.

Plaintiffs have since moved to amend or restrict HUD's counterclaim seeking 7% interest on the project's loan principal balance from May 10, 1983 until paid. Plaintiffs contend a 1% interest rate is required.

Plaintiffs have also moved the Court to reconsider its Order as to defendants' motion for summary judgment on the recoupment claim involving the interest reduction contract, or, alternatively, to strike all testimony at variance with representations that the interest reduction contract reduces the mortgage interest rate from a 7% to a 1% effective rate.

These pending motions, the plaintiffs' civil rights claims, the plaintiffs' "quasi-contract" claim regarding the proposed TPA and the defendants' counterclaim for judicial foreclosure are addressed below.

The Court, having heard the testimony and reviewed the exhibits, and based upon the arguments and briefs of the parties, hereby sets forth its Findings of Fact, Conclusions of Law, Order for Judgment and Memorandum:

### FINDINGS OF FACT

1. The Little Earth of United Tribes housing project ("Little Earth") is a 212 unit low- and moderate-income townhouse and apartment complex located at 24th Street and Cedar Avenue in South Minneapolis.

2. Little Earth is the only major, urban housing project in the country run by American Indians. The project was built in the early 1970's with the proceeds of a $4,521,500 loan insured by the Secretary of the Department of Housing and Urban Development ("HUD") under Section 236 of the National Housing Act, 12 U.S.C. § 1715z–1.

3. The impetus for the construction of Little Earth came from a number of organizations concerned with the lack of affordable housing for American Indians. This concern led to the creation of the South High Nonprofit Housing Corporation ("South High") in April, 1971, to develop and own the housing project.

4. The loan for the construction of Little Earth, then known as the South High project, was made on December 17, 1971 by the Shelter Mortgage Corporation. (Defendants' Exhibit 1). The note and mortgage were subsequently assigned by Shelter Mortgage Corporation to the Federal National Mortgage Association.

5. Section 236 authorizes the Secretary of HUD to insure loans made for the purpose of building low- and moderate-income housing projects. The projects are privately owned, and the mortgages are held by private entities. If the borrower defaults on repayment of the loan, the insured lender may assign the mortgage to HUD in exchange for insurance payments, as provided in 24 C.F.R. § 207.255 *et seq.* Upon assignment of the mortgage, HUD assumes all rights of the original lender, including the right to foreclose if payments are not made.

6. Under a Regulatory Agreement with South High which was executed pursuant to Section 236, HUD controls the rents that South High (subsequently, Little Earth of United Tribes, Inc. ("LEOUT")) charges tenants and prohibits the sale of the project to another owner without HUD's permission. (Defendants' Exhibits 3 and 4).

7. In addition to authorizing mortgage insurance, Section 236 also permits HUD to make monthly "interest reduction payments" directly to the insured lender. HUD makes these subsidy payments in order to reduce the amount of the owner's monthly loan payments and, in turn, to enable the owner to maintain lower rents at the project. 12 U.S.C. § 1715z–1(a). The payments are made each month during the life of the loan, to the mortgagee who owns the mortgage at the time the payment is due. 24 C.F.R. § 236.510.

8. The effect of these payments is to reduce the interest payable by the mortgagor over the life of the loan to the equivalent of 1%. This does not mean, however, that each of the owner's loan payments are calculated at a 1% interest rate. With respect to Little Earth, HUD has contracted to make interest reduction payments which range from $18,535.08 due each month in 1975 to $16,665.13 due each month in 2014, the last year of the mortgage. The amount of interest reduction payment that will be due each month was determined at the outset of the contract and is shown on the amortization schedule. (Defendants' Ex-

hibit 103). Thus, the actual interest rate varies from payment to payment, starting out at approximately 2.55% for the first payment and ending 40 years later with a negative interest rate. (Defendants' Exhibit 115).

9. Interest reduction payments are not always applied against the interest due in the month the payment is made. Instead, the payments are applied "to the items and in the order set out in the mortgage." 24 C.F.R. § 236.525. At Little Earth, as at other Section 236 projects, HUD applies interest reduction payments as follows: Each month, HUD calculates the amount of all sums due on the loan that month, including principal, interest at 7%, operating advances, tax escrows and all other costs which the mortgage requires LEOUT to pay. HUD then applies that month's interest reduction payment against the sums due in the order called for in the mortgage. Interest on operating advances, operating advances, service charges and taxes have a higher priority than payment of interest and principal. (Defendants' Exhibits 101 and 102). Only if the interest reduction payment is enough to pay all of the items that must be paid before interest, is the remainder of the payment applied against interest.

10. Uncontroverted evidence suggests HUD made all of the interest reduction payments due for the Little Earth project for the period between November, 1982 and February, 1987. (Defendants' Exhibits 138 and 139).[1] These payments have been applied as provided in the mortgage documents and HUD regulations.

11. The first residents moved into the project in February 1973. By late 1973, the project was fully occupied. In the early years of the project, the tenant population was racially mixed. This changed by the late 1970's and, since then, almost all of the tenants in the project have been American Indians.

12. The beginning years of the project, under South High, were plagued with management troubles and problems of physical deterioration caused, at least to some degree, by project construction and design defects. Among other things, unfinished landscaping left bare soil in many places creating severe problems with run off and water leakage into basements. Improperly set toilets developed leaks into the floor and the areas below them.

13. The project defaulted on the initial loan payment due January 1, 1975. On February 25, 1975, the Area HUD Office informed the South High board of directors that it should change its "sponsorship" structure or face foreclosure by reason of the mortgage default. HUD sought to eliminate the diffusion of responsibility among the many sponsoring groups which appointed the board's initial 25 members. Instead, HUD insisted that a single sponsoring organization take primary responsibility for selecting board directors and overseeing the project's general operation. (Plaintiff's Exhibit 149).

14. South High agreed to restructure itself. In a community meeting held later in 1975, attended by HUD officials, the South High board selected the American Indian Movement ("AIM") as the project's new sponsoring organization. Subsequently, in February, 1977, the name of the corporation was changed to Little Earth of United Tribes, Inc. ("LEOUT").

15. When AIM accepted sponsorship of Little Earth, it was aware that the project had ongoing maintenance problems, that a number of units were vacant, and that rent collections were lagging. Although HUD held discussions with the new board and AIM representatives concerning the project's future, HUD provided no absolute guarantees to recast the project mortgage or to provide specific subsidies. HUD apparently believed that the mortgage could only be recast as part of a comprehensive

---

1. In dismissing LEOUT's recoupment claim relating to the interest reduction contract, the Court considered the uncontroverted affidavit of Peggy A. Grant, an official of HUD's Office of Finance and Accounting. Grant stated that all interest reduction payments due on the project since June 1975 had been paid. This affidavit was not, however, introduced into evidence at trial.

solution to all of the project's difficulties, both physical and financial.

16. Since the initial default in January 1975, payments which have been received were not large enough to make the loan current. (Defendants' Exhibit 138). The only time during the life of the mortgage when payments were regularly made was during 1978 and 1979. (Plaintiffs' Exhibit 207). Between December 1980 and the filing of this suit, LEOUT made no mortgage payments whatsoever. (Plaintiffs' Exhibit 207).

17. Because of the default, the mortgage was assigned in June 1975 to the Secretary of HUD, who paid more than $4,500,000 in insurance benefits. (Defendants' Exhibit 13). The Secretary has been the owner of the mortgage at all times since and has had all rights of the mortgagee, including the right to foreclose for nonpayment of the mortgage loan. (*Id.*).

18. In addition to the mortgage insurance and interest reduction program, HUD provided additional financial assistance to the project by way of a rent supplement program under which tenants in 84 of the 212 units (40%) were charged only 25% of their income for rent. (Defendants' Exhibits 5 and 6).

19. In 1976, HUD began to replace rent supplement subsidies with subsidies under the "loan management set-aside" program of Section 8 of the Housing Act of 1937, 42 U.S.C. § 1437f. *See* 24 C.F.R. § 886. This program is structured similarly to the rent supplement program, in that tenants occupying subsidized units pay a percentage of their income for rent, and HUD pays a subsidy to the project equal to the difference between the rent paid by the tenant and the "contract" rent. The total income received by the project for any unit is the "contract rent." The Section 8 program is available to families, as well as to elderly and disabled individuals. Under the program, the contract between HUD and project owners runs for a period of 5 years, and is renewable for as many as two more 5–year periods. 24 C.F.R. § 886.111.

20. On August 26, 1976, Little Earth and HUD executed a Section 8 contract which subsidized 128 of Little Earth's 212 units. (Plaintiffs' Exhibit 197). This initial Section 8 contract ran for a term of five years until 1981. A new Section 8 contract executed in September 1977 made subsidies available for all 212 units effective October, 1977. (Defendants' Exhibit 15). No other section 236 project in the state of Minnesota receives Section 8 payments for 100% of its units. In fact, in 1976 and 1977 Little Earth received more than 2% of the Section 8 funding available nationwide for projects with HUD-held mortgages.

21. The contract rents determined by HUD provide all, or virtually all, of the income that is available for project operations. Little Earth could not raise the contract rent without HUD's permission. In Section 8 programs other than the loan management set-aside program, the contract rents are raised each year by application of an automatic adjustment factor ("AAF") published by HUD. However, this is not the case in the loan management set-aside program. Under applicable regulations, the AAF is applied only to the "maximum unit rents" (which are ceilings above which contract rents may not be raised), not to the contract rents under the loan management set-aside program. 24 C.F.R. § 886.112. Thus, the program staff of the Minneapolis HUD office were advised by their counsel not to give AAF increases in contract rents to any project receiving Section 8 subsidies under this program, and they apparently have never done so. (Defendants' Exhibits 95 at pg. 4, 132 and 133). Instead, HUD's policy is to grant contract rent increases only to permit the owner to meet documented increases in operating costs.

22. In 1980, HUD published new regulations with respect to the Section 8 program. These regulations permitted contract rents received by subsidized projects to rise above the maximum unit rent level. These regulations permitted, but did not require, HUD to adjust maximum unit rents either annually or more frequently. Rent adjustments could be done "(1) on the basis of a written request for a rent increase ... or (2) by applying ... the applicable Automat-

ic Annual Adjustment Factor." 45 Federal Register 59149 (Sept. 8, 1980), amending 24 C.F.R. § 886.

23. Although HUD is not required to raise contract rents, HUD's Insured Project Servicing Handbook requires that all rent increase requests be processed within 30 days and that mortgagors be promptly notified in writing of the approval or disapproval of the requests. The handbook also mandates that HUD cite the reasons for any disapprovals. (Plaintiffs' Exhibit 95, pg. 1).

24. HUD requires certain bookkeeping entries of owners receiving Section 8 payments. 24 C.F.R. § 886.119. For example, HUD requires the owner to certify a family's income when the family first moves into the project in order to determine the family's eligibility for Section 8 benefits and to establish the amount the family must pay in rent. In addition, the owner must annually recertify every family's income, composition and medical expenses to determine if the amount of rent the family can pay has changed. These requirements are to insure that the government makes subsidy payments only for families who are entitled to receive the benefit of those payments. They are also designed to ensure that eligible families receive the full benefits to which they are entitled. In order to determine the owner's compliance with program requirements, HUD may review the owner's operations as often as needed. 24 C.F.R. § 886.130.

25. The extended family structure in the American Indian community considerably complicated the work of preparing Section 8 vouchers. Family members would regularly move in and out of households, necessitating burdensome recertifications of income.

26. Little Earth's prospective tenants were required to provide two written landlord statements and two credit references. Landlords were required to mail these statements directly to Little Earth. Phone verifications were not permitted. Tenants were not permitted to pick up the forms (even sealed) from the landlords and deliver them to Little Earth. Initially, HUD re-fused to permit electric or utility credit records as references, despite the fact that many low-income persons had no other credit history. HUD eventually changed this requirement and allowed such credit records as references.

27. If a Little Earth prospective tenant could not produce two landlord statements and two credit references, a guarantor was required to provide a notarized statement guaranteeing payment of the tenant's rent. Guarantors were required to provide the same level of credit references as the prospective tenants.

28. With respect to income verification, HUD did not permit Little Earth's management to use check stubs for income verification. If the tenant had no source of income, HUD required that potential sources of income be checked. As a result, Little Earth personnel routinely sent second or third requests to public assistance workers asking them to verify that someone not on their case load was not receiving income through their program.

29. No waivers of income recertifications were permitted, even if they resulted from a uniform raise in AFDC, Social Security, or other public benefits. Little Earth was not permitted to accept as verification the notice of percentage increase from public assistance plus a copy of a check in the new amount. A recertification mailed by the worker, not hand carried by the tenant, was required. If a person had been on Little Earth's waiting list for over six months, HUD required a complete recertification of eligibility.

30. There was evidence introduced to show that the bookkeeping requirements imposed on Little Earth were more onerous than at other HUD sponsored projects. For example, Myra Knudson, who from June 1980 to February 1983 managed Oak Grove Towers, a property including approximately 70 Section 8 units, testified that she did no credit checks beyond checking by telephone with a prospective tenant's current landlords. She did not perform verifications of people on the waiting list. To verify income, Knudson relied on check stubs. If a person did not have a source of

income, their word was accepted and verifications of potential public income sources were not required. While at Oak Grove, Knudson was never required to obtain a guarantor for a tenant. She was never advised that her practices were unacceptable.

31. Similarly, Janet Stately, who had served as assistant manager and manager of the Little Earth project, had screened tenants and done certifications with another project in Eliot Park during the summer of 1983. At that time, she was permitted by HUD to screen tenants by telephone, rather than by utilizing the extensive written credit checks which had been required of her at Little Earth.

32. Significantly, Knudson's experience at Oak Grove and Stately's experience at Eliot Park, however, are not directly analogous to Little Earth. Most of the Oak Grove tenants were elderly so there were relatively few changes in tenant income family composition. Unlike Little Earth, Oak Grove did not have ongoing management and financial problems. In fact, Knudson's work was reviewed only once during her three year tenure. Stately worked at the Eliot Park project for only three months. During that period, only one new tenant moved into the project. Furthermore, Stately had no contact with HUD officials.

33. HUD granted increases in Little Earth's Section 8 contract rents effective August 1976, March 1977, and June 1978 after determining that the additional subsidies were needed to pay increased operating costs. (Plaintiffs' Exhibits 114 and 170; Defendants' Exhibit 18). The rent increase of June 16, 1978 was the last increase which HUD approved for Little Earth prior to this Court's appointment of a receiver.

34. By November 1978, HUD's review of monthly payment vouchers and other documents submitted by LEOUT regarding the Section 8 payments had caused the Department to become concerned about LEOUT's management practices and its compliance with Section 8 procedures. Between October 1977 and September 1978, LEOUT's vouchers for Section 8 payments were consistently late and contained numerous inaccuracies resulting in overpayments by HUD. Also, a large number of required annual recertifications of tenants' income were overdue. Moreover, there had been a recent turnover in LEOUT's management staff.

35. Because of these problems, Department employees visited Little Earth in November 1978 and again in March 1979 to review the project's tenant files and occupancy procedures. (Defendants' Exhibits 19 and 20). Their reviews were critical. The tenant files were in disarray, making it impossible to tell who lived in which units and who had left the project. Without this information, it was impossible to submit accurate Section 8 vouchers. Income recertifications had not been performed on time, and when they had been done, they were not done properly. HUD also was concerned that there was severe over- and under-utilization of units. In some cases, as many as six people were occupying an efficiency unit while two people occupied a three- or four-bedroom unit. Such conditions contribute directly to physical deterioration of the units, increase maintenance costs of the project, and jeopardize eligibility for Section 8 payments.

36. Because of the many problems found in the review, HUD could not be sure that its Section 8 payments were in the correct amounts or that tenants were receiving the proper benefits of the program. On May 29, 1979, HUD wrote to LEOUT's on-site director outlining the deficiencies found in the project's occupancy procedures and providing detailed instructions for correcting these procedures. (Defendants' Exhibit 20).

37. In July, 1979, Howard Goldman became chief of the loan management branch of the loan management and property disposition section of the HUD area office. It was in this capacity that Goldman first worked directly with Little Earth.

38. In October 1979, HUD conducted a third review of LEOUT's tenant records and occupancy procedures. This time, HUD employees spent three days at the

project conducting the review. Once again, LEOUT's management was found to be seriously deficient. Many of the problems that had been disclosed nearly a year earlier had not been corrected, and there were several new ones. (Defendants' Exhibit 22) HUD was particularly concerned about the frequent use of the project for emergency and transient housing. The Indian community's temporary housing demands caused overcrowding resulting in continual unit transfers. This complicated program management, and, presumably, contributed to deterioration of the physical plant.

39. According to plaintiffs, HUD's refusal to acknowledge the special nature of the extended family in the American Indian community exacerbated the concern about persons moving in and out of the project for temporary housing.

40. In any event, HUD determined that the primary cause of project deficiencies was the lack of proper direction from project management, as opposed to lack of adequate rental income. Accordingly, on January 2, 1980, HUD wrote to LEOUT describing the results of HUD's latest review and outlining in detail what steps LEOUT should take to correct the shortcomings disclosed by the review. (Defendants' Exhibit 26). HUD did not receive a written response to this letter; none had been requested.

41. On December 21, 1979, LEOUT submitted a proposed budget and retroactive rent increase request for the fiscal year August 1, 1979–July 31, 1980. (Defendants' Exhibit 24). HUD contends that there was insufficient information about project operations to allow a determination of whether the rent increase was necessary. On January 4, 1980, HUD area director Thomas Feeney wrote to LEOUT requesting more information concerning the proposed budget. (Defendants' Exhibit 27). Feeney's letter, drafted by Douglas Strandness, did not request a written response.

42. Instead, HUD staff discussed the budget with LEOUT representatives at a meeting held in February, 1980. (Plaintiffs' Exhibit 251 at p. 5). HUD remained dissatisfied with the quality of information provided at the meeting. Contrary to the requirements of the agency's own handbook, however, HUD never formally approved or denied in writing the proposed budget and rent increases.

43. In early 1980, while HUD was withholding action on Little Earth's request for Section 8 contract rent increases, HUD entered into a "work-out" agreement with Cedar Square West, a project with all-white ownership and management. Cedar Square West, like Little Earth, was "self-managed," in the sense that the management company was a subsidiary of the owner.

44. Cedar Square West had a history of management problems. On December 31, 1974, HUD had sent a letter to the owners of Cedar Square West requiring compliance with a number of items prior to HUD's approval of a rent increase. (Plaintiff's Exhibit 266). This letter resulted in part from a memorandum which set out a number of violations of both the management and regulatory agreements by Cedar Riverside, and which concluded that "it is apparent that Cedar Riverside does not consider either the Management Agreement or Regulatory Agreement to be of any importance. Their attitude indicates a lack of responsibility and understanding in the management of a multi-million dollar housing project." (*Id.*)

45. As of September 1975, one of the Cedar Square West mortgages had been assigned to HUD. As of March 1976, three additional Cedar Square West mortgages had been assigned to HUD.

46. The assignment did not end financial irregularities of Cedar Square West. According to a HUD memorandum dated August 4, 1976, the management agent, which was affiliated with the owner, had taken $882,422 in advances on its management fees. (Plaintiffs' Exhibit 269). The tenants' security deposit account had been utilized for operating expenses and was underfunded by $55,625. *Id.*

47. HUD loan servicer Douglas Strandness testified that HUD viewed these irregularities as good-faith errors. In any

event, these irregularities continued and the disagreement over unearned management advances had not been resolved by the time of the work-out.

48. Despite these financial and management problems at Cedar Square West, HUD approved a 10 percent rent increase in 1976; an additional 15 percent subsidy increase in July of 1977; entered into a one-year work-out agreement to postpone payment of mortgage delinquencies in August of 1977; and entered into another one-year provisional work-out in August of 1978. In April of 1980, when the mortgage delinquency was in excess of $5 million, HUD entered into an agreement permitting the repayment of the delinquency over a 15 year period; agreed to a section 8 rent increase; and committed itself to pay approximately $1.5 million in flexible subsidy funding over a three-year period. William Cooley, who, as Deputy Mayor of Minneapolis, had been involved in the work out negotiations with Cedar Square West testified, "HUD bent over backwards to accommodate the guys that were in ownership position on Cedar Riverside."

49. In the spring of 1980, in response to HUD's assertions of deficiencies in recertifications and financial record-keeping, LEOUT hired accountant Daniel Knowland. LEOUT also hired a professional data processing service, ADP, to process its payrolls.

50. In late April, 1980, HUD occupancy specialist Sue Landais conducted the second comprehensive review of the project within six months. Over half of the 209 tenant files reviewed contained improper section 8 certifications. (Defendants' Exhibit 28). Landais concluded that overall management quality was decreasing.

51. That same month Strandness indicated that he intended to complete review of Little Earth's 1979 rent increase request and inspect the development in the near future. (Plaintiffs' Exhibit 55).

52. However, in late April, Strandness turned over the Little Earth loan portfolio to Thomas Nagle. Before this time, Nagle had had no contact with anybody at Little Earth, or any direct involvement as part of his job duties with the Little Earth project.

53. When Strandness turned the LEOUT portfolio over to Nagle, Strandness believed LEOUT's financial problems could be solved. He had found the board to be cooperative. Strandness regarded Little Earth as being next on agenda to be put back on its feet.

54. In May 1980, HUD and LEOUT discussed the possibility that LEOUT might receive "flexible subsidy" funding for the project under Section 201 of the Housing and Community Development Amendments of 1978, 12 U.S.C. § 1715z–1a. This was the first year in which funds were available under the program.

55. The flexible subsidy program is not an entitlement program. (Defendants' Exhibit 120, Section 1–4). Accordingly, the area office of HUD, in making a flexible subsidy request, was required to find that several statutory criteria had been, or would be, met during the period in which the subsidy was to be made available. (Defendants' Exhibit 120, Section 1–8). Among these criteria is the proper management of the project. (Defendants' Exhibit 120, Section 1–8d).

56. In June 1980, the area HUD office sent an application for flexible subsidy funding to the central HUD office. This application requested flexible subsidy funding in fiscal year 1981 for six Minnesota projects, the fourth in priority being Little Earth. (Plaintiffs' Exhibit 76). Although HUD officials did not believe Little Earth's management was acceptable in June 1980 when the local office requested flexible subsidy for the project, it did initially believe that LEOUT would make the necessary improvements before the funding became available.

57. In the June, 1980 flexible subsidy application, the area HUD office explicitly recognized that "without flexible subsidy assistance this project cannot be made physically, and concurrently, financially viable, and foreclosure by HUD will result." In the same application, HUD also indicated the need for, and the propriety of,

amortizing the current delinquency over the remaining mortgage term. (*Id.*)

58. The area HUD office did not characterize the Little Earth board of directors as difficult or obstructionist. The flexible subsidy application said "management has been cooperative with us in the past." The application expressed confidence "that our [HUD's] concerns ... can and will be corrected and the necessary changes implemented." The application stated "we also require that members of the Board of Directors devote a larger part of their time and effort to personal involvement in the day-to-day operations of the project." The statement suggests that HUD was not at that time worried about the board's excessive interference in successful management. On the contrary, HUD seemed to advocate additional board involvement.

59. By late 1980, local HUD officials had completed their Little Earth management review and financial audits and decided that LEOUT did not, or would not, meet the statutory requirement of acceptable management. 12 U.S.C. § 1715z–1a(d)5. (Defendants' Exhibit 42). This conclusion was substantiated by evidence introduced at trial.

60. Accordingly, in a January, 1981 letter, HUD told LEOUT that the area office had applied for a Flexible Subsidy Program grant of approximately $1.6 million but conditioned Little Earth's receipt of any of said funds upon "transfer [of] the ownership of LEOUT to a sponsoring organization acceptable to HUD." (Defendants' Exhibit 46).

61. During this period, Thomas LaSalle, Little Earth's outside management consultant since late 1975, found it increasingly difficult to work with the Little Earth board. LaSalle resigned in January, 1981. At this time, he characterized the project as in deep trouble because of inflation and denial of rent increases.

62. HUD never offered flexible subsidy funding to the Little Earth project, except in the context of HUD's demand that the Little Earth board transfer project control to an entity acceptable to HUD. HUD regional consultant Robert Rohlwing testi-fied he was unaware of any HUD subsidized project besides Little Earth, where HUD had conditioned the availability of flexible subsidy funding on such transfer of control.

63. The Minneapolis HUD office was notified in February, 1981 of the amount of flexible subsidy funds that had been allocated to it. In May, 1981, additional funds were allocated to the office. (Defendants' Exhibits 121 & 122). The local office did not get all of the money for which it had asked. Moreover, in order to avoid recapture by the HUD central office, funds had to be under contract by June 30, 1981. Local HUD officials determined that Little Earth could not meet the program requirements by June, so they did not give any flexible subsidy funds to the project.

64. Cedar Square West received all of the $960,000 which had been requested on its behalf. HUD was obligated to provide these funds under its April 1980 work-out agreement with the owner of Cedar Square West. Three other projects on the June 1980 application received flexible subsidy grants. Lonnie Atkins Court, a project which was not even listed in the June 1980 flexible subsidy application nevertheless received a flexible subsidy grant. (Compare Plaintiffs' Exhibit 76 with Plaintiffs' Exhibit 251, pg. 7).

65. Of the projects included in the Area HUD office flexible subsidy application of June 12, 1980, the only one besides Little Earth which did not receive assistance was Hopkins Village, for which HUD had requested money to replace fogged window panes.

66. Of the projects which did receive flexible subsidy funding from the Area HUD office in 1981, all were considered troubled, and two were described by HUD as having had bad management. (Compare Plaintiffs' Exhibit 251, pg. 6–7, with Plaintiffs' Exhibit 256, pp. 9–11 and Plaintiffs' Exhibit 255, pg. 13).

67. Shortly after Thomas Nagle assumed responsibility as loan servicer for the Little Earth project, he determined that rental subsidies to the project would not be

increased until completion of a full-scale review of Little Earth's management and operations. Howard Goldman concurred in this decision. This decision was not unreasonable.

68. Both of these men were aware that the last rental increase for the Little Earth project had been in June of 1978 and were aware that a rent increase had been requested in 1979 but had not been granted. They did not, at this time, inform the Little Earth project that they had decided that rent increases would be withheld pending the results of these inspections. This decision should have been communicated to the LEOUT board.

69. In May and June, 1980, HUD conducted a comprehensive review of Little Earth's management and physical condition. The physical inspection occurred on May 19, 1980; the management review was carried out from May 28 to June 4, 1980.

70. A report of physical condition and estimate of repair costs was finalized and signed on June 13, 1980. Using a three point scale, thirty-seven individual exterior, interior and miscellaneous items were rated. Thirteen items were deemed acceptable. Twenty-four were noted as requiring maintenance within one year. No items were rated as requiring immediate attention. The project's maintenance operation was rated unsatisfactory. (Defendants' Exhibit 44).

71. The June 13, 1980 management review report was signed by Thomas E. Nagle and Douglas Strandness. (Plaintiffs' Exhibit 76). This report rated Little Earth's management on 39 individual items and five summary items. Of the individual items, eleven were rated as requiring immediate action and 22 were rated as needing correction within one year. The overall management was deemed unsatisfactory.

72. Based on these reports, the area HUD office justifiably concluded that the project was in serious financial and physical trouble. According to HUD's evaluations, the physical plant was deteriorating and LEOUT had inadequate maintenance, security, and tenant selection programs. The reports also noted that bookkeeping was inadequate, bills were not being submitted to HUD, tenant security deposits were not properly credited with interest as required by state law, and the project's staff were not receiving adequate training before assuming their responsibilities. Many tenants were behind in their rents, but few, if any, were ever evicted.

73. On June 16, 1980, the physical condition and management review reports were submitted to HUD's central office in connection with the area office's application for flexible subsidy funding. (Plaintiffs' Exhibit 76). Notwithstanding the fact that the reports indicated that a number of items needed action, HUD did not release the reports to LEOUT for six months. HUD's delay in submitting the results of its inspection was assertedly due to the press of other business, the resignation of a key area office employee who was intimately acquainted with Little Earth, the disruption caused by relocating the HUD office, and a desire to wait for the results of the financial audit performed by HUD's office of inspector general. Such delay is disturbing because it reduced LEOUT's opportunity to respond to negative review findings.

75. Even more disturbing is the fact that when the reports were finally released to LEOUT on January 15, 1981, HUD produced a different version of the management report, ostensibly based on the same May 28—June 4, 1980 review. In this version of the management report, signed by Nagle and Goldman, as opposed to that signed by Nagle and Strandness, each of the 22 items which the original management report indicated could be corrected within one year were now listed as requiring immediate attention. As in the earlier report, the overall management operation was deemed unsatisfactory. (Defendants' Exhibit 43).

76. The Court is not willing to conclude, as plaintiffs suggest, that HUD deliberately falsified the later version merely to justify its foreclosure decision. For one thing, even the initial version of the report was sufficiently critical to support a foreclosure decision. Moreover, it appears likely that

the more critical January report reflects the results of HUD's intervening independent financial audit. To the extent this is correct, HUD should have so informed LEOUT. It did not.

77. On July 3, 1980, Ronald Melchert, chairman of the LEOUT board, wrote to Thomas Nagle, asking for an explanation of the delayed approval of the proposed 1980 budget. (Defendants' Exhibit 30). HUD never responded in writing. Moreover, Melchert testified that although he spoke several times with Nagle, Nagle never orally explained the basis of HUD's denial or withholding of the rent increase requests.

78. LEOUT next asked for a rent increase of $80 per unit per month on September 3, 1980, in connection with a proposed budget for the fiscal year ending on July 31, 1981. (Defendants' Exhibit 32). The requested rent increase was calculated to permit operation of the project at a break-even point. Fifteen dollars of the requested per unit per month increase was solely to cover tax increases.

79. HUD officials neither approved nor denied the rent increase request. Nagle testified that the request was incomplete because it did not propose a rent schedule. However, Nagle admitted, and Strandness also testified, that an incomplete submission alone would be an insufficient basis for denying a rent increase.

80. In any event, no HUD official explained the inaction to LEOUT. By this time, Nagle and other HUD officials had concluded that the project was not being properly managed and rent increases could not be justified. These conclusions were bolstered by an audit of LEOUT's financial records prepared by HUD's Office of Inspector General shortly after HUD conducted the management and physical conditions review.

81. The financial audit, begun on July 14 and completed on September 29, 1980, covered the period from July 1, 1978 to June 30, 1980. Tentative results were discussed with LEOUT staff at an exit conference on September 17, 1980; a final audit report was issued on October 22, 1980 and released to LEOUT on November 19, 1980. (Defendants' Exhibit 38). The audit made ten specific findings and recommendations. Specifically, the audit noted there were unreliable books of account, poor administrative controls over cash received, improper use of project funds for non-project operations, inadequate documentation to support project disbursements, questionable payments to consultants, questionable administrative expenses, inadequate control over fixed assets, inadequate payroll records, improper documentation of tenant eligibility and inaccurate completion of Section 8 vouchers.

82. On January 2, 1981, LEOUT responded to each of the findings by letter. (Defendants' Exhibit 40). LEOUT attempted to justify existing procedures with respect to certain audit findings, and accepted HUD recommendations with respect to others. By the end of 1980, LEOUT began the process of inventorying all of the project's physical assets unit by unit. Based on HUD's recommendations, the LEOUT board ceased payment of community service program expenses from the Little Earth account, discontinued stipends paid to board members for child care and other expenses related to attending board meetings, and eventually required that residents pay their rent by check or money order as opposed to cash.

83. In a letter dated January 15, 1981, HUD notified LEOUT of the results of the June, 1980 management review. (Plaintiffs' Exhibit 8). HUD's letter stated that, because of the physical and managerial problems at Little Earth and the mounting mortgage deficiency, foreclosure of the project's mortgage could only be avoided if two conditions were met: (1) transferring control of LEOUT to an organization which could conduct its affairs in a businesslike way; and (2) hiring a professional property management firm to manage the project. (Plaintiffs' Exhibit 8).

84. HUD's statement that LEOUT could avoid foreclosure by transferring control of the project to an organization capable of running its affairs in a businesslike manner was not meant as a demand

that the project be transferred out of American Indian control. The statement itself places no limits at all on the identity of the new sponsor, other than that it have a successful history of conducting its affairs in a businesslike manner. In fact, several HUD officials testified they considered the Indian Health Board a good sponsor candidate.

85. The letter of January 15, 1981, acknowledged that substantial expenditures—estimated between $1 and $1.6 million—were needed to return the Little Earth project to acceptable physical condition. The letter also indicated that Little Earth had a mortgage delinquency in excess of $700,000. The letter indicated that physical rehabilitation and curing the delinquency could be resolved only through a combination of flexible subsidy funding and a formal work-out agreement providing for the reamortization of delinquent principal and interest. However, the letter stated: "HUD will consider neither flexible subsidy funding nor a workout agreement unless the actions outlined above are taken." (*Id.*)

86. HUD's January 15, 1981 letter did not condition flexible subsidy funding, mortgage recasting, and continued Section 8 monies upon management practices but upon the structure of management and the structure of ownership.

87. HUD officials testified that mere changes in management policies or the hiring of a professional management agent alone would not have satisfied the demands made in the January 15, 1981, letter. Only the transfer of control of ownership to another sponsoring organization acceptable to HUD would have been regarded as full compliance with the conditions set forth in the January 15, 1981, letter.

88. Howard Goldman testified that HUD could have "qualified" Little Earth to get flexible subsidy in early 1981 if Little Earth had met HUD's conditions—that is, for the Little Earth board of directors to divest control of the property to another organization acceptable to HUD.

89. HUD had the option of insisting on Little Earth's hiring a management agent without the board's transferring ownership. However, HUD never made this request except in connection with the demand that the Little Earth board transfer ownership to another entity acceptable to HUD.

90. HUD officials assumed, in sending their January 15 letter to the Little Earth project, that the board would interfere with or make impossible the efforts of an independent manager to run Little Earth.

91. The St. Paul–Minneapolis HUD Area Office had, prior to Little Earth, made only one other demand of a project owner requiring the transfer of control of ownership to another entity acceptable to HUD.

92. This was at Torre de San Miguel in July, 1980, where the tenants were predominantly Hispanic, and where the board was at the time of the demand predominantly Hispanic. (Plaintiffs' Exhibit 253, p. 10). HUD contended the project was experiencing financial and management problems and its physical condition was deteriorating.

93. HUD Undersecretary Philip Abrams indicated that, besides the Little Earth project, he could not name another instance where HUD informed a project owner that flexible subsidy monies would be available, but only upon condition that the owner would have to transfer the project to another entity. (Abrams deposition, pp. 38–39.)

94. While the demand for a change of control was exceptional, the record does not establish that it was unjustified. First, the demand came some six years after the project's initial mortgage default. Second, the agency's on-site inspections, comprehensive management reviews and financial audit detailed recurring problems that were not being adequately remedied.

95. The January 15 letter also stated that Little Earth's existing subsidies (the annual interest reduction payments of approximately $220,000 and the annual Section 8 assistance contract of $530,000) would be jeopardized if the steps demanded were not taken.

96. Absent from the letter was any indication of why HUD had not acted on the

pending 1979 and 1980 rent increase requests. Nor did the letter suggest actions which could be taken to obtain such increases or any future increase.

97. Officials of the area HUD office were aware that HUD's failure to respond to Little Earth's requests for Section 8 rent increases in 1979 and 1980 had made less money available to the project. Yet, at the time of the letter, no HUD official had performed any analysis to learn what amount of Little Earth's mortgage deficit was due to HUD's inaction upon Little Earth's requests for contract rent increases.

98. On January 22, 1981, a letter, over the name of area manager Feeney, was sent to the consultant for the Little Earth project, which asked that Little Earth execute and return an enclosed "counterpart" of the Little Earth Section 8 contract. (Plaintiff's Exhibits 17 and 23). By calling this a "counterpart," HUD implied that it was similar to the contract earlier executed.

99. In fact, this purported "counterpart" would have made extensive changes to Little Earth's Section 8 subsidy contract with HUD. First, it would have cut short the term of the subsidy contract by about one year. Second, the level of contract rents (and therefore operating income for the project) would have been significantly lowered as to each apartment and townhouse at Little Earth.

100. Through its attorney, Little Earth returned the substitute document, unsigned, to HUD area director Feeney. (Defendants' Exhibit 45).

101. The HUD files of the 187 multiple unit housing projects in Minnesota other than Little Earth which received direct payments, direct low-interest loans, or mortgage subsidies through the Section 236 or Section 221(d)(3) programs between June 16, 1978 and April 25, 1984 (Plaintiffs' Exhibits 249 and 258) indicate that none includes proposed amendatory contracts which would have reduced the amount or the length of a subsidy period.

102. HUD contends, and the Court accepts, that the counterpart contract was sent in error, because of confusion in HUD's records regarding the date Little Earth's 1977 contract was to be renewed.

103. On February 25, 1981, in response to HUD's letter of January 15, 1981 and the management review submitted in connection with it, the Little Earth board of directors submitted a lengthy and detailed proposed management plan and response to HUD's concerns regarding its financial management. Little Earth's accountant Daniel Knowland, together with a number of members of the board of directors, joined in its preparation. The report replied to the individual items addressed in HUD's management review report. LEOUT's response did not, however, disclose any willingness to meet either of HUD's two conditions for avoiding foreclosure. In connection with this submission, Clyde Bellecourt of the Little Earth board of directors addressed a letter to Thomas Feeney inviting him to meet regarding the issues raised in HUD's management review report and Little Earth's response to them. (Defendants' Exhibit 46).

104. Feeney responded on April 28, 1981 by scheduling a follow-up review to determine if LEOUT's corrective actions adequately cured the problems outlined in the management review. (Defendants' Exhibit 48).

105. HUD conducted a second management review in June and July, 1981. HUD did not, however, provide LEOUT with the written results of this review until it sent a letter on September 25, 1981, indicating that the local office would be recommending foreclosure of the Little Earth Project. (Defendants' Exhibits 57–59). By the time LEOUT received the results, it was too late for it to change management practices in order to prevent foreclosure.

106. On July 21, 1981, Little Earth submitted a proposed operating budget for the year 1981/1982, noting simply that it "should be based on large rent increases." LEOUT also requested HUD's help in securing additional funding to make up for flexible subsidy funding allocated to other

projects but not to Little Earth. (Defendants' Exhibit 53).

107. HUD did not formally act on the proposed budget or rent increase request. Goldman testified that by this time, based on results of the second management review, local HUD officials had decided to recommend that HUD foreclose the mortgage and address the project's subsidy requirements after the Department acquired title through foreclosure.

108. On September 25, 1981, HUD's Minneapolis Area Manager notified LEOUT that because of the worsening physical and financial conditions at the project, because control of LEOUT had not been transferred to an organization acceptable to HUD, and because LEOUT had not hired a professional management firm, he planned to recommend to HUD's Central Office in Washington, D.C. that the mortgage on the project be foreclosed. (Defendants' Exhibit 57). By that time, the loan was nearly $900,000 in arrears and, since January 1980, less than six months worth of payments had been made on the loan. (Defendants' Exhibit 101).

109. Attached to the September 25th letter were updated Management Review and Physical Condition Reports based on inspections conducted on June 9 and July 7, 1981. (Defendants' Exhibits 58 and 59). Although these reports indicate improvements in some areas when compared to reports a year earlier, the overall general management practices and management operations were rated unsatisfactory.

110. Notwithstanding the fact that HUD's Insured Project Servicing Handbook requires a written response to rent increase requests within thirty (30) days, the September 25th letter constituted HUD's first written response to Little Earth's pending rent increase requests for the 1979, 1980 and 1981 fiscal years.

111. HUD cited LEOUT's management deficiencies as justification for HUD's failure to take action on the rent increases and proposed annual budgets. In addition, Thomas Nagle and Donald Myers both testified without contradiction that LEOUT failed to timely submit annual independent financial audits.

112. Said audits were due within sixty days of the end of the project's fiscal year. Although the audits were not timely submitted to HUD, the certified public accounting firm of Elmer Fox, Westheimer & Company had timely prepared audits for each of the fiscal years ending July 31, 1978, July 31, 1979, July 31, 1981 and July 31, 1982. (Plaintiffs' Exhibits 283, 284, 175 and 169). The audit for fiscal year ending July 31, 1980 was prepared some 18 days late. (Plaintiffs' Exhibit 285).

113. During the entire time that Little Earth was under Goldman's supervision, or in the loan portfolio of Nagle, HUD refused to grant rent increases to the project.

114. The refusal to grant or in any way act on the rent increase requests was during a period of high inflation. Withholding rent increases effectively reduced operating funds for the housing project.

115. Generally, HUD-subsidized Section 236 or 221(d)(3) housing projects within the State of Minnesota received regular rent increases. In fact, projects received increases on at least an annual basis. Only four projects, in addition to Little Earth, were denied rent increases at any time by HUD. All of these projects subsequently received rent increases. (Plaintiffs' Exhibit 258).

116. In contrast to Little Earth, none of the four projects showed substantial objective indications of financial distress such as mortgage delinquencies exceeding six months of regularly scheduled payments. None were listed by HUD as being financially "troubled."

117. In answers to interrogatories, HUD listed eight projects as having received overall "unsatisfactory" ratings on a Management Review Report (HUD form 9834) and/or a Report of Physical Condition (HUD form 9822). (Plaintiffs' Exhibit 255, pp. 11 and 12). With the exception of the Little Earth project, none of these projects was among those to which HUD had denied requested rent increases.

118. The significance of these comparisons, however, is lessened by the fact that there is no evidence which, if any, of the projects had HUD-held mortgages; had been in default since 1975; had inadequately fulfilled Section 8 bookkeeping obligations; received adverse audit findings; or were managed by a non-profit corporation through its board of directors without on-site assistance of a professional management agent.

119. Plaintiffs have not presented sufficient evidence to show that the findings in HUD's Occupancy and Management Reviews and the HUD Office of Inspector General Audit are unjustified, invalid or false. In fact, LEOUT's independent auditor, Elmer Fox, and Westheimer & Company, made findings in their reports for the fiscal years ending in 1980, 1981, and 1982 that, in part, were consistent with findings of HUD's own auditors. (Plaintiffs' Exhibits 285, 175 and 169). These findings noted, *inter alia*, that the project lacked adequate cash controls, improperly used project funds for unreasonable or non-project purposes; participated in other grant funding without approval; and lacked subsidiary information on fixed assets. (Plaintiffs' Exhibit 285, pp. 23–25).

120. The Area Manager made his foreclosure recommendation to Washington on September 30, 1981 (Defendants' Exhibit 60), and the recommendation was subsequently accepted. On March 4, 1982, HUD notified LEOUT by letter that the mortgage debt had been accelerated and that the entire unpaid principal balance plus interest on the balance was then due. (Defendants' Exhibit 65). On March 13, 1982, HUD began advertising the nonjudicial foreclosure sale of the Little Earth project. (Defendants' Exhibit 66). The sale was scheduled to take place on May 3, 1982. (Id.) At that time, HUD's records indicate LEOUT's total accelerated debt was $5,256,776.64. (Defendants' Exhibit 108).

121. From its inception, Little Earth was designed to be an Indian housing project, run by Indians and serving low-income Indian families. For official HUD purposes, however, Little Earth was al-ways considered a standard Section 236 housing project and not specialized Indian housing. According to HUD, the term "Indian Housing" is a term of art, applying to housing developed and operated by the Indian Housing Authorities for the benefit of lower income Indians and native Alaskans. Thus, when HUD decided to foreclose, HUD did not consult with their own Indian Housing Program.

122. At no time did the HUD local office address the issue of how the denial of Section 8 rent increases exacerbated Little Earth's financial default.

123. HUD made no formal analysis of the potential effect of the mortgage foreclosure on displacement of Little Earth's Indian tenants. (Plaintiffs' Exhibit 251, pg. 10).

124. HUD did not produce an Environmental Impact Statement or Environmental Assessment, finding no significant impact, under the National Environmental Policy Act, in connection with its decision to foreclose.

125. Numerous witnesses testified, and the Court finds, that the Little Earth housing project is an important cultural and housing resource for the American Indian population of Minneapolis.

126. Little Earth is made up primarily of families. Many of these are large and have related members who move in and out of the household. Moreover, many of these families have non-blood related extended families whose members also move in and out of the households.

127. Minneapolis contained one-quarter of all American Indians in the State of Minnesota counted by the 1980 census. Census tract 73, which contains the Little Earth housing project, contains 11.6 percent of the Indian population of the City of Minneapolis. When fully occupied, the Little Earth project represented 84.1 percent of all American Indian occupied housing in that census tract and 8.4 percent of all American Indian occupied housing units in all of Minneapolis. (Plaintiffs' Exhibit 260, pg. 5).

128. Professor Calvin Bradford, a senior fellow at the Hubert Humphrey Institute of Public Affairs and an expert in patterns of housing and housing markets, found that, since 1960 the American Indian population had shifted from St. Paul and the north side of Minneapolis to the Philips area of Minneapolis and the surrounding area. This area contains the largest native American cultural center and the widest range of social, economic and political organizations serving American Indians. The Little Earth housing project is located in the heart of this community. Professor Bradford concluded that the housing market served by the Little Earth housing project was defined by the 15 census tracts that are part of or adjacent to the Philips neighborhood of south Minneapolis, with the Little Earth housing project at the center.

129. Since 1980, the housing market in the Philips neighborhood has become much more competitive, with the influx of several thousand Southeast Asian households. These were not even counted in the 1980 census. New construction could well be expected to be devoted to high-income households. To the extent that there exist public and private efforts to rehabilitate the housing stock in the communities around Philips, these efforts raise the value of the housing stock, encourage higher-income people to compete for housing in the neighborhood and make it even more difficult for American Indians to find housing in this neighborhood. (Plaintiffs' Exhibit 260, pp. 5–7).

130. Little Earth's 212 units represent 64.8 percent of all of the publicly assisted family housing units in the Philips community. 97.4 percent of Little Earth's residents are classified as very low-income.

131. On the basis of the above information, Professor Bradford concluded that, if the Little Earth housing project lost its subsidies or was closed, those who are typically housed there would have a difficult time finding comparable housing anywhere in the City of Minneapolis and an extremely difficult time finding housing within the local American Indian housing market.

They might well be forced to choose between being displaced from their community and living in over-crowded conditions with friends or relatives or paying disproportionate amounts of their income for shelter. Although nearly half of the units at Little Earth are three, four or five bedroom units, Professor Bradford found that at the median household income for the residents of Little Earth, they would pay 85.5 percent of their income for a two bedroom apartment at fair market rent levels defined by HUD.

132. Donna Folstad, Little Earth's on-site manager from April 7, 1984 to June 1985, testified that prior to her work as Little Earth manager, she had worked for 13 months as aide to Mayor Al Hofstede on issues relating to Indian housing, education and police protection; and had worked for the Minnesota Chippewa Tribe on issues relating to urban housing. Following her work with Little Earth, she returned to employment by the Minnesota Housing Finance Agency where she continues her work.

133. Folstad testified that, in her work for the Minnesota Chippewa Tribe, she received 628 assistance requests for safe, decent and affordable housing by American Indians living in urban areas in Minnesota. She had been able to assist only 128 of these families via mortgages, rental housing and rehabilitation. She testified that in the last ten years, reservation housing (which received approximately 90 percent of state funds allocated to Indian housing) had been improved by 700 units, but was still inadequate to meet the need.

134. HUD itself recognizes that Native Americans in Minneapolis have special housing needs. For example, in connection with the Community Development Block Grant ("CDBG") Program, the HUD area office concluded that in 1979 the City of Minneapolis had violated the CDBG Program by failing to identify the special housing needs of Native Americans. (Plaintiffs' Exhibit 153). HUD directed the city to amend its housing assistance plan to address said needs. In addition, after a monitoring review dated December 24,

1985, HUD criticized the Minnesota Community Development Agency for failing to keep records as to whether minorities were able to obtain or afforded the opportunity to obtain housing. (Plaintiffs' Exhibit 248).

135. Little Earth has functioned not only as a housing project but as a community center and has, in this role, developed a number of social service programs for the benefit of Little Earth residents and Indian people from outside the project.

136. The Little Earth community room provides a needed place for important religious ceremonies. Little Earth developed a day care program in 1978 which now serves 20 children who come from 13 to 15 families. A weatherization program was developed to train people to employ weatherization strategies and to weatherize units.

137. Little Earth has developed an emergency food shelf which is staffed largely on a volunteer basis. It provides food not only for Little Earth residents but for the surrounding area. Little Earth also has developed a youth services program in East Philips Park. It persuaded the Minneapolis Park Board to open the park and to set policy for its operation.

138. Little Earth has raised money for repairs of the project (through the resident association and the board). These repairs have included such cosmetic repairs as repairing soil erosion and retaining walls, cleaning the steps and hallways of apartment buildings, repairing broken boards surrounding the patio units in the townhouses and ending leakage and erosion into basements by moving ground and building retaining walls.

139. The Little Earth community is tied closely together and tied culturally with the rest of the American Indian community of Minneapolis. It functions as an identifiable community within the larger urban area.

140. HUD officials who made decisions regarding Little Earth, including the decision to foreclose, never expected that the project's tenants would be displaced as a result of the foreclosure and never acted with an intent to displace or otherwise harm the tenants. Although there is some evidence to the contrary, the weight of the evidence clearly shows that HUD officials expected that the Department would acquire the project.

141. In 1982, HUD's standard policy was to bid 90% of the amount owed (including interest and principal) at foreclosure sales of properties with HUD-held mortgages. In almost every case this resulted in HUD's being the successful bidder. HUD officials have always intended to make a 90% bid at the Little Earth foreclosure sale (Defendants' Exhibit 130) and have represented to this Court that they will do so. This is apparently in conflict with current HUD policy which calls for a bid equal to the property's appraisal value.

142. When HUD decided to foreclose on Little Earth, it was virtually certain that HUD would be the successful bidder at the sale because the 90% bid HUD expected to make (more than $4.5 million) far exceeded the value of the property, and any other bidder would have had to pay the full price in cash.

143. Plaintiffs argue that the HUD central office memorandum authorizing a 90% bid proves that HUD did not expect it would be the successful bidder at the foreclosure sale. The memorandum indicated "you should bid on the personalty only *if* your bid for the realty is successful," and requested the area office to notify HUD's central office as to the outcome of the sale, the amount of the successful bid or bids and the date of possession "*if* the secretary is the successful bidder." (Emphasis supplied). While this memorandum indeed suggests some uncertainty, it is far from conclusive evidence of HUD's intent or expectations.

144. Some HUD officials evidently did consider options other than a 90% bid. A July 2, 1982 memorandum prepared by Howard Goldman, and signed by HUD acting area manager Robert Gerber, reviewed alternatives to foreclosure which were under discussion with HUD consultant Robert Rohlwing. The alternatives included: HUD making "a very low offer at the sheriff's sale, $50,000 perhaps, in the hope

that we will be outbid"; cancelling all subsidies and turning the project over to the board of directors; and a negotiated sale to the Community Development Corporation. (Plaintiffs' Exhibit 58).

145. Goldman conceded that if HUD had bid only $50,000 for the Little Earth project at foreclosure it would have been outbid. At the same time, however, Goldman testified that he did not take Rohlwing's "low bid" suggestion seriously as it was contrary to Department policy. Moreover, HUD officials testified that neither Roy Demmon, the central office recipient of the memorandum, Goldman, the memorandum's drafter, nor Rohlwing, the consultant who originated the idea, had actual decisional authority.

146. The July 2, 1982, memorandum originated by Howard Goldman and signed by acting area director Robert Gerber, refers to potentially violent disturbances or threats including the use of arms to prevent HUD from taking possession of the project after foreclosure. However, neither Gerber nor Goldman testified that any violent events had ever taken place in connection with HUD's attempt to foreclose on the Little Earth project. Neither man could identify any threats he himself had heard concerning potential violence.

147. HUD's Little Earth files contained a publication by the Department of the Army describing the characteristics of riot control agent CS, which the publication described as an agent which had "been referred to as super tear gas because of its more potent action." (Plaintiffs' Exhibit 67). Plaintiffs argue that, presumably, this publication was in HUD's files because of the fears of one or more HUD officials that riot control methods would be necessary in order to deal with the Little Earth tenants and/or the Little Earth board. However, there was no evidence whatsoever to establish who placed the information in the file or for what purpose.

148. HUD's published foreclosure notices did not contain restrictions requiring the anticipated purchaser of the Little Earth project (if it was not HUD) to continue devoting the project to use for low- and moderate-income housing. However, Donald Myers testified without contradiction that HUD did not employ such "use restrictions" in 1982.

149. The Court finds no discriminatory intent in HUD's decision to proceed with non-judicial foreclosure under Minnesota law rather than under the Multifamily Mortgage Foreclosure Act (the "Act"), 12 U.S.C. §§ 3701 *et seq.* Under the Act, which became effective October 1, 1981, HUD must provide continued subsidies to occupied projects and impose low- and moderate-income use restrictions. 12 U.S.C. § 3706(b)(2)(A). However, the Secretary has no obligation to use the federal foreclosure procedure. 12 U.S.C. § 3703 ("[m]ultifamily mortgages held by the Secretary ... may be foreclosed by the Secretary in accordance with this chapter, or pursuant to other foreclosure procedures available, at the option of the Secretary.") Moreover, implementing regulations for the Act were apparently not promulgated until February 24, 1984. 49 F.Reg. 7074 (1984), codified at 24 C.F.R. §§ 27.1–27.65.

150. If HUD acquires title to Little Earth, its subsequent management and sale of the property must be consistent with the goals set out in Section 203 of the Housing and Community Development Amendments of 1978, 12 U.S.C. § 1701z–11. The first of the goals in Section 203 is to keep projects which are occupied by low- and moderate-income persons at the time of acquisition available for continued use by those people. 12 U.S.C. § 1701z–11(a)(1). Additional goals include maintaining existing housing stock in decent, safe and sanitary condition, using this housing stock for rental or cooperative housing, and minimizing involuntary displacement of tenants. 12 U.S.C. § 1701z–11(a)(3), (4) and (6). Section 203 has been implemented by HUD pursuant to regulations found at 24 C.F.R. Part 290.

151. When HUD acquires a subsidized property, such as Little Earth, the tenants continue to pay the same rents as they did before the project was sold. 24 C.R.F. § 290.17. Before selling a project, the Department develops a detailed property dis-

position analysis which includes tenant comments, physical and financial analyses of the project, and a discussion of how local housing needs and conditions affect disposition of the project. The decision on how to dispose of the property is based on this analysis. 24 C.F.R. §§ 290.35, 290.37 and 290.40 (1982). Under present policy, HUD assures that the purchaser will make all necessary repairs.

152. The first step in the preparation of the property disposition analysis is an initial determination of whether or not the property will be recommended for sale with subsidy. If the property was formerly subsidized, it must be disposed of with a subsidy sufficient to assist all eligible tenants residing in the project. 24 C.F.R. §§ 290.-23, 290.17(b) (1982).

153. In the case of Little Earth, HUD made an initial determination that the project should be sold with a Section 8 contract to subsidize 100% of the units for 15 years from the sale date. (Defendants' Exhibit 96). Defendants' counsel repeatedly represented to the Court that this remains HUD's plan.

154. Although HUD minimized the threat of displacement, it nonetheless prepared flyers for distribution to Little Earth residents which stated that displacement may occur and that several existing programs might be available to provide assistance. (Plaintiffs' Exhibit 261).

155. Moreover, both Donald Myers and Maurice Barksdale, Assistant Secretary for Housing and Federal Housing Commissioner, testified that HUD was not explicitly required to continue providing Section 8 subsidies to the Little Earth project after foreclosure. First, there is no guarantee that sufficient Section 8 funding will be available to fulfill HUD's promise. Second, currently unoccupied units not repaired before sale and rented to Section 8 tenants could be rented to people able to pay market rental rates. Third, HUD could determine that a greater need for the assistance existed elsewhere. Indeed, pursuant to 24 C.F.R. § 290.27(b), the HUD director is authorized to determine that it would prefer a racial and economic mix different than the

existing tenant population. Presumably, Section 8 assistance could be withdrawn from some or all of the units at Little Earth in order to permit more affluent white tenants to move in.

156. In that event, however, HUD would provide current tenants with individual 5–year Section 8 voucher certificates. Such vouchers enable a displaced tenant to move to any housing project which accepts the vouchers. Obviously, extensive use of the voucher program at Little Earth would facilitate displacement of Indian tenants.

157. This same displacement threat may occur, however, if HUD is prevented from foreclosing. Under current administration policy, when Little Earth's existing Section 8 contract expires in 1992, existing tenants will be issued the 5–year Section 8 vouchers. Thus, HUD's promise to sell the project with a 15 year Section 8 contract subsidizing 100% of the units may provide the best protection against displacement.

158. In early 1982, the LEOUT board of directors and its attorney extensively researched and pursued the possibilities of syndicating limited partnership interests in Little Earth. The board's hope was to raise as much capital as possible through syndication without sacrificing the influence of the board of directors over policy concerns.

159. On April 16, 1982, LEOUT's attorney requested a 90–day extension of the foreclosure sale to continue negotiations on the transfer of physical assets. (Defendants' Exhibit 70). HUD granted an extension to August 2, 1982. (Defendants' Exhibit 71); and later to August 16, 1982. (Defendants' Exhibit 108).

160. HUD and LEOUT continued to negotiate throughout the summer of 1982 in an attempt to avoid foreclosure.

161. On June 30, 1982, the LEOUT board of directors amended its articles of incorporation to expand the board from 7 to 12 members. The additional five directors were to be selected to reflect technical expertise and/or demonstrated experience in fields associated with the activities of the Corporation. (Plaintiffs' Exhibit 73).

162. On July 22, 1982, the board voted on and approved six new directors, selecting the five new positions and filling an existing board vacancy. The new directors included Karen Clark, a Minnesota state representative since 1980; William Cooley, a former aide to the mayor of Minneapolis and a real estate developer and investor; Harold Segal, an accountant with a national CPA firm; Fred Hanks, a senior accountant with the Salvation Army; Robert O. Naegele, Jr., president of Naegele Management Company; and Wendell Anderson, former governor of the State of Minnesota. (Defendants' Exhibit 75). Of the six new appointees, only Fred Hanks is American Indian. Together with the six American Indian directors who constituted the board prior to July 22, 1982, the Hank's appointment resulted in an expanded board composition of seven American Indians and five non-Indians.

163. Representative Clark testified that the Little Earth board's procedures were equivalent to other board of directors she had served upon. In fact, she testified that Little Earth is more careful to follow proper procedures and pay attention to detail because it is under such close scrutiny.

164. Board member Cooley echoed these conclusions. He testified that the quality of project management from mid- to late–1982 was excellent because dedicated people who knew what they were doing were operating the project on a shoestring.

165. At about this time, Thomas Feeney, the HUD area manager, asked Robert Rohlwing, a Department consultant who had experience in the syndication of HUD projects, to come to Minneapolis and attempt to work out a deal that would avoid foreclosure. Rohlwing was never explicitly told that a change in project sponsorship was a necessary element of a solution. However, based on the project's repair problems, its mortgage default, and representation by HUD local staff, Rohlwing concluded that the LEOUT board was difficult to deal with and a change in sponsorship was required.

166. On July 20, 1982, a number of Little Earth board members, residents and Minneapolis City officials met with Rohlwing and other HUD officials to discuss syndication options. Rohlwing asked LEOUT to submit a proposal discussing the feasibility of: 1) generating syndication proceeds in excess of $1,000,000; 2) changing the composition of the board to include seven members (instead of five) from outside of the non-profit organization; 3) changing the management agent; and 4) obtaining funds from the City for repairs.

167. Board member Cooley testified that he interpreted Rohlwing's request for "professional" control of the board as synonymous with white control of the board.

168. In a letter dated July 23, 1982, acting area manager Gerber promised Little Earth's attorney that the date of the mortgage foreclosure sale would be extended two weeks in the event the proposal submitted by Little Earth on or before July 27, 1982, was not acceptable to HUD. (Plaintiffs' Exhibit 1).

169. On July 26, 1982, Rohlwing addressed a memo to his superior in the HUD central office, Roy E. Demmon, summarizing developments at Little Earth. (Plaintiffs' Exhibit 71). Rohlwing stated that from an economic standpoint a work-out agreement was preferable to foreclosure. This conclusion followed from his assessment that HUD would realize little or nothing from a sale after foreclosure. To support this assessment, Rohlwing noted that Marvin Hilman of the HUD central office had told him that after foreclosure, HUD would probably sell the project for $1 with 100 percent Section 8 assistance available to the purchaser. According to Hilman, his prediction generally reflected the practices of that time period. His reference to a $1 sale price was, however, merely a figure of speech designed to imply that HUD would realize little on the resale. (Hilman Deposition, pp. 13, 16–17 and 21).

170. Rohlwing also suggested that a work-out was preferable to avoid bad public relations and "harassment,"—problems Rohlwing speculated might occur based on "the history of this group [LEOUT]."

171. Rohlwing also stated that a "one million dollar reserve fund will be the key

ingredient" to assure the City and potential investors that sufficient monies were available to service debt and operations. He added, however, that HUD could include provisions in the settlement agreement that would authorize withholding the reserves in the event of violations of the regulatory and/or management agreements. He specifically hypothesized that "in the event the Indians take over the project, we would not pay out funds and simply hold for a two- or three-year period at which time we could use the reserves for payments of the surplus cash loan." (Plaintiffs' Exhibit 71).

172. This statement has clear racial overtones. But consultant Rohlwing's racist hypothesizing is not HUD's discriminatory policy.

173. On July 27, 1982, the Little Earth Corporation submitted to HUD a large packet of information addressing the four areas of concern set out by Rohlwing in the meeting of July 20, 1982. The submission included a number of exhibits setting forth the strategic plan of the Little Earth board of directors; an agreement between Little Earth and Westminster Corporation to work toward the development of a management plan and management contract between the two organizations; a letter indicating the commitment of the Minneapolis Community Development Agency to perform a complete structural, managerial and financial analysis of the Little Earth project; an expression of concern and support by the Mayor of Minneapolis; and a letter from Petrie Development Corporation indicating its belief that it would be possible to raise in excess of $1 million to contribute toward the project's need through a syndication of partnership interests in the project. (Plaintiffs' Exhibit 2). Moreover, by this time, LEOUT had already expanded its board of directors to twelve members.

174. Although Rohlwing reviewed the submission from Little Earth dated July 27, 1982, he did not determine if it addressed his concerns, and stated he did not know if any other person made that assessment. (Rohlwing deposition, pp. 57–60).

175. The highest HUD official whose testimony is contained in the record, Philip Abrams, Undersecretary of HUD from October of 1983 to November of 1984, testified that the agency had been obligated to review the Little Earth board's submission of July 27, 1982, but testified that he had never seen it before. (Abrams deposition, pages 34–35). Roy E. Demmon, Rohlwing's direct supervisor, testified in his deposition that while the letter of July 27, 1982, appeared to address the four concerns set out by Rohlwing, he did not know who had reviewed it and had not done so himself. (Demmon deposition, pp. 25–27). Truman Holland, Demmon's supervisor, who took his position as Director of the Office of Financing and Preservation on August 9, 1982, and described this as involving "absolute responsibility" for the foreclosure of HUD held mortgages (Holland deposition, pp. 7–8, 18–19), testified in his deposition that he had never before seen the letter of July 27, 1982 to Rohlwing. (Holland deposition, pg. 54).

176. Obviously, no meaningful review was made of this document by Rohlwing, his immediate supervisors, or any known individual at HUD.

177. On July 28, 1982, a letter drafted by Rohlwing, and signed by HUD's area manager, Thomas Feeney, was sent to LEOUT, ostensibly in response to Leventhal's July 27, 1982 letter. (Defendant's Exhibit 76).

178. The July 28th letter indicated that among the commitments essential for HUD to consider a delay in foreclosure was "the commitment of the current ownership to relinquish control of the management and ownership of this development." The letter stated that Feeney would recommend that HUD consider postponing the foreclosure of the Little Earth project provided it received the following:

1. An executed management contract with an approved HUD management agent, effective no later than August 17, 1982.

2. An approved Board resolution adding one more business/professional member to the Board from outside

the American Indian Community. This will result in seven members from outside the Community and constitute a majority of the Board.

3. A formal commitment from the City of Minneapolis to fund the total project repairs, estimated to be 1.5 MM Dollars.

4. An executed purchase/option agreement with a developer/syndicator subject to HUD approval.

*Id.*

179. Rohlwing testified that the wording of the second demand relating to board composition was intended to assure that new board members were professional and business people disassociated with the current sponsorship of Little Earth project. In reviewing the draft before signing it, Feeney concluded it did not imply that only non-Indians would be acceptable.

180. While the demand relating to board composition shows great insensitivity in choice of words, the Court believes that the letter was intended as a demand for transfer of the project to a business-oriented or professional majority, not to a non-Indian majority.

181. Plaintiffs contend that the additional conditions for postponement of the foreclosure sale were deliberately made to be impossible to execute. Indeed, numerous witnesses, including Minneapolis Mayor Fraser, affirmed the impossibility of obtaining within two weeks a $1.5 commitment from Minneapolis city government. Similarly, numerous witnesses confirmed that syndication of an interest in Little Earth to private investors on a limited partnership basis could not be accomplished within two weeks. The Court concludes that HUD officials knew that the two week deadline was wholly unrealistic.

182. In the context of events preceding the July 28th ultimatum, however, HUD's demands were not irrational or unreasonable. HUD informed LEOUT that foreclosure was imminent as early as September, 1981. In the intervening ten months, extended discussions had taken place regarding syndication options and LEOUT repeatedly represented to HUD that the board was actively negotiating a transfer that would avoid foreclosure. Mayor Fraser conceded on cross examination that city cooperation would have been more likely to have been arranged if LEOUT had requested assistance in October, 1981 instead of waiting until July, 1982.

183. The expanded Little Earth board attempted to satisfy one of HUD's conditions for avoiding foreclosure by proposing to retain Realty Management Services, Inc. ("RMS") as its management agent. RMS manages a large number of both market rate and HUD-subsidized rental units. The firm is headed by the same Thomas LaSalle who served as LEOUT's management consultant from late 1975 until early 1981. When asked to assume the management role, LaSalle initially felt the same animosity from board members that led to his resignation in 1981. After meeting with the board, however, LaSalle determined he could accept the position.

184. HUD refused to approve RMS to manage Little Earth, even though the firm was approved to manage other HUD projects. HUD believed that RMS had not provided satisfactory management at Bluff Estates and Stephens Homes, two other troubled HUD projects. In addition, HUD believed that LaSalle had been ineffective in his role as a consultant at Little Earth.

185. At the recommendation of the area HUD office, the board entered into negotiations with the Westminster Corporation to determine if it would become management agent for the project. Two other management agencies recommended by HUD, Sentinel Management Company and National Coalition of Housing Partnerships ("NCHP"), were not seriously considered. After initial inquiries, the board determined that Sentinel had never managed any properties it did not already own and had no interest in managing Little Earth. NCHP was based out of Minnesota, which the board reasonably regarded as a serious disadvantage.

186. Westminster was reluctant to undertake management of the project without assurances that funds would be made avail-

able to pay for its services and to cover past and continuing indebtedness of the project. Nonetheless, LEOUT drafted it own management plan which was then submitted to Westminster for review. (Plaintiffs' Exhibit 25).

187. In response to a letter from Westminster, HUD agreed that it would grant a rent increase request, with certain restrictions, if LEOUT hired a HUD-approved management agent such as Westminster. (Plaintiffs' Exhibits 18 and 28). Indeed, after this Court appointed Westminster as the project's receiver, HUD granted a 40% rent increase effective in July, 1984 to cover increased operating expenses. Even this significant increase was not intended to facilitate regular mortgage payments.

188. Ultimately, the board was unable to persuade Westminster to undertake management responsibilities. According to Joseph Errigo, Westminster's Executive Vice President, Little Earth was unable to delegate sufficient management authority to an independent agent and still meet its objectives of self-determination for the project and its residents. HUD's inability to guarantee needed funding was also a factor.

189. While the board was unable to complete negotiations for syndication by the time it commenced this lawsuit on August 13, 1982, the board did continue its negotiations and eventually drafted a proposed memorandum of understanding for a Transfer of Physical Assets ("TPA") with Real Property Services Corporation. The proposal was presented to HUD in August, 1983. (Defendants' Exhibit 111).

190. The TPA proposal followed upon several June 6, 1983 meetings between HUD officials and LEOUT representatives which were initiated by Senator Rudy Boschitz and took place in Washington, D.C.

191. HUD officials made no express promises to accept a particular proposal but indicated that they would seriously consider an offer including an initial cash contribution of between $1.25 and 1.5 million. (Plaintiffs' Exhibit 243). HUD also indicated that upon approval of an independent management agent for the project, HUD would consider the possibility of retroactive Section 8 rent increases. In addition, HUD officials mentioned the possibility of utilizing supplemental funding options to facilitate a syndication transaction and project rehabilitation. These options included supporting a Section 241 second mortgage loan, flexible subsidy funding and mortgage recasting.

192. The memorandum of understanding with Real Property Services Corporation provided for a capital contribution of at least $1.3 million. (Defendants' Exhibit 111). The proposal also provided that management would remain with LEOUT as long as its debts were paid and would ultimately revert back to the Indian community.

193. After reviewing the proposal, HUD officials determined it was unacceptable. In a September 22, 1983 letter to the syndicator, HUD indicated that it would require a $1.2 million cash contribution to clear delinquent interest, as well as the purchaser's commitment to complete all necessary repairs estimated to cost between $1.8 and 2.8 million. HUD indicated its willingness to recast the delinquent loan principal, but required that a potential purchaser keep the mortgage current during the work-out period. (Defendants' Exhibit 112). Although the September 22 letter does not so state, the fact that the LEOUT board remained the general management partner under the proposal was clearly a major factor underlying the proposal's rejection.

194. HUD had discretion to designate additional funds from a variety of programs to aid the syndication effort. It chose not to do so and, instead, indicated it would require the project purchaser to perform all necessary repairs.

195. Evidence was introduced to suggest that for the period around 1983, it was common for HUD to contribute toward the solution of financial defaults and physical deterioration in projects which had raised their own capital through a TPA process. For example, Steven Parliament cited the Las Casidas project in California, a project owned by a non-profit organization, whose

HUD held mortgage was apparently in default. The work-out agreement for that project included a TPA and HUD assurances that it would match, dollar for dollar, the capital contribution which was raised by the owner through the TPA process or through any other means.

196. Parliament further testified that he had never been involved in a TPA process for a HUD project where HUD expected that all of the money to solve the project's physical and financial problems would come from the private sector. However, Parliament's testimony is not particularly persuasive in light of the fact that he was personally involved in only five or six TPA's during the six years he was vice president of the John Stewart Company in California.

197. There is no clear evidence that HUD officials seriously considered financially contributing toward a work-out agreement once Little Earth produced the $1.3 million syndication offer. No individual HUD witness was able to testify that he examined the possibility of correcting inequities in prior Section 8 subsidy payments, flexible subsidy funding, rewriting the principal of the mortgage, or supporting a Section 241 second mortgage loan.

198. HUD did not introduce evidence that it compared the agency's financial return if it accepted Little Earth's syndication proposal with HUD's financial return upon foreclosure and resale of the project. Donald Myers testified this comparison was not normally made during HUD TPA reviews. The Court did, however, hear the testimony of plaintiffs' witness, Jack Cann, making just such comparisons.

199. Cann is an attorney working as an independent contractor with the Minneapolis Community Development Agency, retained to negotiate redevelopment contracts and develop public financing mechanisms for major redevelopment projects, including the Minneapolis Convention Center Hotel. Formerly, he had been employed by the West Bank Community Development Corporation, where he developed financing packages, syndication projections and coordinated the development of five

housing projects totalling approximately 450 units and $27 million in development costs. He is familiar with rehabilitation projects involving HUD subsidies, Urban Development Action Grants and other forms of financing. In addition, Cann has coordinated the development of an urban renewal plan and developed a tax increment financing plan for the Cedar Riverside urban renewal area.

200. Cann analyzed plaintiffs' proposed TPA to determine whether it would have been realistic to expect the limited partners to contribute more than $1.3 million as a capital contribution to the project. He testified that, given the risks of such investments, the standard "internal rate of return," that is, the amount of tax reduction for the money invested, was approximately 30 percent. His analysis demonstrated that an investment of $1.3 million would have produced an internal rate of return of approximately 30.1 percent. Consequently, he concluded that HUD could not rationally have expected a limited partnership capital contribution of more than $1.3 million. (Plaintiffs' Exhibit 263).

201. Cann further concluded that the $1.3 million capital contribution available under the TPA proposal exceeded by four or five times the capital that could possibly be made available for rehabilitation under the alternative "purchase after foreclosure" scenario. Cann conceded, however, that even a $1.3 million contribution would not meet the project's outstanding capital needs.

202. Cann determined that limited partners in a "purchase after foreclosure" scenario who contributed $1.3 million to the project would have lost more than six percent on their investment over a 15 year period. In order to realize the same 30 percent internal rate of return as would have been made available under Little Earth's TPA proposal, Cann estimated that limited partners purchasing the project after foreclosure could offer only an initial $321,000 to retire delinquent bills and rehabilitate the project. (Plaintiffs' Exhibit 264).

203. LEOUT attempted at trial to demonstrate that its loan payments to HUD would be current through December 1986 if HUD had adjusted project rents by using the automatic adjustment factors. (Plaintiffs' Exhibit 288). Nicholas Romer, a certified public accountant audited Little Earth's financial records. He determined that had rent increases been approved and applied to principal, interest, taxes and insurance for the period 1975 to 1983, and had contributions to replacement reserve been held not applicable, Little Earth would have paid its mortgage commitment in full and still have had a considerable surplus.

204. Such speculation is neither relevant nor convincing. One of the assumptions underlying this claim is that LEOUT would have used all of the money it received in rent increases to pay its mortgage debt to HUD rather than to pay increased operating expenses. This is unrealistic because it assumes that project operating costs remained the same from June 1978, (the date of the last approved increase), until December 1986, enabling LEOUT to use all additional revenue received after June 1978 to pay its mortgage. Obviously, operating costs increased during this period, as plaintiffs themselves have asserted. More importantly, as noted above, HUD was not obligated to grant rent increases by using the automatic adjustment factors. Romer's testimony was based on the mistaken assumption that the mortgage is amortized at 1%.

205. On August 13, 1983, this Court granted defendants' motion for appointment of a project receiver and, on October 7, 1983, the Court appointed Westminster as receiver. In a later Order dated November 8, 1983, the Court specified in detail the receiver's duties and authority, and also directed that HUD advance expenses as set forth in paragraphs 6, 11 and 12 of said Order. The Order does not explicitly apportion the receivership expenses except to provide for their initial payment by HUD.

206. According to HUD's records, as of February 12, 1987, LEOUT's accelerated loan indebtedness to HUD was as follows:

| | |
|---|---|
| $4,519,777.40 | As unpaid Principal (Defendants' Exhibit 138, pg. 4 "Balance at end of period"). |
| $2,271,944.41 | As unpaid interest at 7% per annum (Defendants' Exhibit 138, pg. 4, "Item I1"). |
| $ 327,717.85 | As advances for taxes (Defendants' Exhibit 138, pg. 4, "Item A1"). |
| $5,166,704.25 | Operating advances and Foreclosure expenses (Defendants' Exhibit 138, pg. 4, "Items A2 and A3"). |
| $ 167,493.66 | As interest on operating advances and Foreclosure expenses (Defendants' Exhibit 138, pg. 4, "Items G1, G2, and G3"). |

207. HUD has charged LEOUT with responsibility to repay it for expenses of the receivership, including rehabilitation. These advances, if considered, almost double LEOUT's total accelerated indebtedness. As more fully explained in the attached memorandum, the Court does not approve this allocation of expenses. Plaintiffs are not in default as to such monies; the advances cannot be utilized by defendant as partial support for foreclosure.

208. In 1985, HUD, LEOUT, the Tenants' Council, and Westminster Corp., entered into negotiations for the settlement of this lawsuit. At that time, Westminster was also engaged in a large scale rehabilitation of the project which, pursuant to the court's order, was to be paid for by advances from HUD's insurance funds.

209. In May, 1985, the parties had developed a framework for a settlement involving the transfer of the project to HUD and subsequently to an entity to be established by the Community Development Corporation, ("CDC"), a nonprofit arm of the Archdiocese of St. Paul and Minneapolis, and Westminster's parent organization. The parties agreed to continue negotiations and postpone trial which was then scheduled for early June 1985. No agreement was made as to price for the project, or who would bear rehabilitation costs.

210. In early August, 1985, Westminster submitted a written settlement proposal. Under the proposal, HUD would bear rehabilitation costs. HUD objected to the manner whereby the final terms of the sale would be negotiated; the price for which the project would be sold; the scale and

timing of the repair program; and apportionment of attorneys fees.

211. At about this time, settlement negotiations were suspended as HUD and Westminster became involved in proceedings before this Court and the Court of Appeals regarding Westminster's Little Earth rehabilitation expenditures. In the fall of 1986, the parties resumed negotiations but could not reach agreement.[2]

## CONCLUSIONS OF LAW

1. As previously held by this Court, plaintiffs' administrative action claims are insufficient to establish an equitable defense to foreclosure. *United States v. Victory Highway Village*, 662 F.2d 488 (8th Cir.1981).

2. Even if HUD's denial of rent increases and flexible subsidy funding was a potential defense to foreclosure, which they are not, the decisions are not reviewable because committed to agency discretion as a matter of law pursuant to Section 10 of the Administrative Procedure Act. 5 U.S. C. § 701(a)(2).

3. Assuming the rent increase and flexible subsidy decisions are both relevant and reviewable, the standard of review is the "arbitrary and capricious" standard of section 706(2) of the APA. Under this standard, HUD's denial of rent increases and flexible subsidy funding is fully justified. In contrast, HUD acted arbitrarily and capriciously by failing to act on and respond in writing to LEOUT's rent increase requests and proposed annual budgets. This arbitrary failure to communicate otherwise substantiated agency decisions is no defense to foreclosure. At this late date, the Court is simply without a remedy for this particular type of administrative abuse.

4. Actions of the parties to resolve their dispute after HUD began advertising the nonjudicial foreclosure sale in mid–March, 1982, are immaterial and collateral to HUD's decision to foreclose, and therefore,

discretionary. *United States v. OCCI, Co.*, 758 F.2d 1160, 1165 (7th Cir.1985).

5. Thus, even if HUD made arbitrary demands during 1982 negotiations to forestall foreclosure, or arbitrarily rejected the 1983 proposed TPA, such actions would not present an equitable defense to foreclosure.

6. Moreover, even assuming HUD's conduct was relevant and reviewable, neither HUD's conduct during the 1982 negotiations nor the agency's rejection of the 1983 proposed TPA was arbitrary and capricious.

7. None of the defendants violated the Fifth Amendment of the United States Constitution; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 *et seq.;* or 42 U.S.C. §§ 1981, 1982 or 1985(3).

8. HUD did not breach the Section 8 contract by denying requested rent increases or failing to apply automatic adjustment factors to raise contract rents. HUD is simply not legally required, by statute, regulation or contract to raise the project's contract rents.

9. HUD did not breach the interest reduction contract by failing to make required payments. Plaintiffs' motion for reconsideration of this Court's January 14, 1987 Order granting defendant's motion for summary judgment on plaintiffs' recoupment claim regarding the interest reduction contract must be denied.

10. The mere fact that HUD apparently has made all of its required interest reduction payments does not transform LEOUT's 7% loan into a 1% loan. HUD may properly seek 7% interest on LEOUT's unpaid obligations under the contract. Accordingly, plaintiffs' request to amend defendant's counterclaim to reduce the amount of interest sought by the Secretary on the unpaid balance of the loan from 7% to 1%, or to strike the Secretary's demand for interest entirely, must be denied.

---

2. By letter dated May 8, 1987, plaintiffs submitted supplemental proposed findings of fact relative to HUD's alleged negligence in tendering payment of the project's 1985 real estate taxes. This Court declines to make or adopt findings on such matters, which were not the subject of direct testimony at trial.

Plaintiffs' alternative request to strike all testimony heard at trial which is at variance with the conclusion that the interest rate on the loan has been reduced to 1% must also be denied.

11. HUD's failure in September, 1983 to approve the proposed memorandum of understanding for a Transfer of Physical Assets with Real Property Services Corporation was not a breach of "quasi-contract."

12. Pursuant to paragraph 17 of the mortgage, and Section 207(k) of the National Housing Act, 12 U.S.C. § 1713(k), the Secretary, as mortgage owner, is entitled to foreclose on the project mortgage.

13. LEOUT is indebted to HUD in the amount of the unpaid loan principal balance of $4,519,777.40, plus interest thereupon at 7% per annum. LEOUT is also indebted to HUD for all costs incurred by HUD in conducting a foreclosure of the mortgage, plus interest thereupon at 7% per annum.

14. Plaintiffs are not in default as to expenses, operating advances or rehabilitation monies advanced by HUD to the project receiver; the advances cannot be utilized by defendant as partial support for foreclosure.

15. To the extent, if at all, that interest reduction payments were applied against said advances, as would have been appropriate had the Court accepted HUD's allocation of receivership expenses, HUD must make appropriate reductions in the outstanding interest balance.

## ORDER FOR JUDGMENT

Based upon the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED:

1. Plaintiffs' motion for reconsideration of this Court's January 14, 1987 Order granting defendant's motion for summary judgment on plaintiffs' recoupment claim regarding the interest reduction contract is denied.

2. Plaintiffs' motion to amend defendant's counterclaim to reduce the amount of interest sought by the Secretary on the unpaid balance of the loan from 7% to 1%, or to strike the Secretary's demand for interest entirely, is denied. Plaintiffs' alternative request to strike all testimony heard at trial which is at variance with the conclusion that the interest rate on the loan has been reduced to 1% is also denied.

3. LEOUT is indebted to HUD in the amount of the unpaid loan principal balance of $4,519,777.40, plus interest thereupon at 7% per annum.

4. LEOUT is also indebted to HUD for all costs incurred by HUD in conducting a foreclosure of the mortgage, plus interest thereupon at 7% per annum.

5. HUD shall within fifteen (15) days provide the Court with an updated account of foreclosure expenses and outstanding interest due on such expenses, as well as interest due on the principal loan balance. To the extent, if at all, that interest reduction payments were applied against advances to the receiver, HUD must make appropriate reductions in the outstanding interest balances.

6. HUD's counterclaim for judicial foreclosure is granted. The property, if sold to a purchaser other than the Secretary, will be sold subject to deed and use provisions that will assure that the property will continue to be used as low- and moderate-income housing. The proceeds of said sale are to be applied to the amount due under the terms of the judgment and plaintiffs shall have no right of redemption after foreclosure. In the event the sale price of the property is not sufficient to satisfy the counterclaim-plaintiff's judgment, a deficiency judgment in such amount as the Court may find just and proper shall issue.

7. Plaintiffs' Complaint and Supplemental Complaint are in all respects dismissed, plaintiffs have and recover nothing of defendants, and the action is dismissed with prejudice. LET JUDGMENT BE ENTERED ACCORDINGLY.

## MEMORANDUM

I. *Administrative Action Claims*

■ Plaintiffs' "administrative action" claims were dismissed by this Court in 1983

on HUD's motion for summary judgment. 584 F.Supp. 1287. At that time, relying on *United States v. Victory Highway Village,* 662 F.2d 488 (8th Cir.1981), the Court concluded that, even assuming reviewability, none of the claims were relevant defenses to foreclosure. The Court further concluded that, with respect to rent increase and flexible subsidy decisions, HUD's actions were unreviewable as "matters committed to agency discretion by law under Section 10 of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701(a)(2)." *Id.* at 1291.

More than four years later, and after full trial, the Court reaffirms those earlier conclusions. The Court has, nonetheless, carefully reviewed the agency's decisions, and, with the exceptions noted below, concludes that HUD's actions were not arbitrary and capricious or an abuse of discretion.

A. *Rent Increase and Flexible Subsidy Funding Denials*

■ The centerpiece of plaintiffs' case is that HUD's decision to refuse rent increases for fiscal years 1979, 1980 and 1981, and HUD's failure to award flexible subsidy funding, calls the very existence of default into question. Plaintiffs' cause and effect logic is simply unconvincing. *See United States v. Wennick,* 645 F.Supp. 103, 107 (D.Del.1986).

Plaintiffs' case is dramatically weakened by the fact that HUD granted increases in Little Earth's Section 8 contract rents in 1976, 1977 and 1978. In fact, in 1977, two years after default, Little Earth received 2% of all Section 8 funding available nationwide for projects with HUD-held mortgages. At the same time, Little Earth was the only section 236 housing project in the state of Minnesota to receive section 8 payments for 100% of its units. Continuing default in the face of such agency largess belies plaintiffs' claim that HUD's administrative decisions some four years after the initial mortgage default doomed the project.

In addition, even if HUD were obligated to increase contract rents, which it was not, or if HUD had abused its discretion in denying rent increases, which it did not, it is unrealistic to assume that LEOUT would have used all of the money it received in rent increases to pay its mortgage debt to HUD rather than to pay increased operating expenses.

Flexible subsidy funding no doubt would have promoted much-needed project rehabilitation. But it is far from clear how such funding would cure the longstanding mortgage default.

Even assuming that HUD's rent increase and flexible subsidy denials were potentially relevant with respect to HUD's foreclosure rights, the weight of authority holds that such decisions are matters committed to agency discretion under Section 10 of the APA, 5 U.S.C. § 701(a)(2). 584 F.Supp. at 1291, *citing Grace Towers Tenants Ass'n v. Grace Housing Development Fund Co., Inc.,* 538 F.2d 491 (2d Cir.1976); *Harlib v. Lynn,* 511 F.2d 51, 56 (7th Cir. 1975). *See also Frakes v. Pierce,* 700 F.2d 501, 503–06 (9th Cir.1983); *Falzarano v. U.S.,* 607 F.2d 506, 512–13 (1st Cir.1979); *Hahn v. Gottlieb,* 430 F.2d 1243, 1149–50 (1st Cir.1970).

This line of authority is not undermined by plaintiffs' citation to *Sicuro v. Harris,* 597 F.2d 1235 (9th Cir.1979) or *Abrams v. Hills,* 415 F.Supp. 550 (C.D.Cal.1976), *aff'd,* 547 F.2d 1062 (9th Cir.1976), *cert. granted sub nom. Pierce v. Abrams, judgment vacated as moot,* 455 U.S. 1010, 102 S.Ct. 1700, 72 L.Ed.2d 127 (1982). These cases merely hold that Congress did not intend to commit the implementation of specific subsidy programs to the complete discretion of the Secretary. *Sicuro* (rent supplement payments pursuant to 12 U.S.C. § 1701s); *Abrams* (periodic interest reduction payments pursuant to 12 U.S.C. § 1715z–1). Whether to implement a specific subsidy program at all is clearly a distinct and separate question from whether to increase or decrease the amount of a subsidy.

*Underwood v. Hills,* 414 F.Supp. 526 (D.D.C. 1976), upon which plaintiffs also rely, is totally inapposite. There, the Court directed retroactive payment of wrongfully withheld subsidies after concluding that the Secretary was statutorily mandated to make an award.

Here, in contrast, the Secretary was not statutorily obligated to make rent increases or apply annual automatic adjustment factors. Plaintiffs incorrectly assert that 24 C.F.R. § 886.112 mandates annual rent increases based either on a project owner's written request or, in the alternative, on application of automatic adjustment factors. Section 886.112, however, begins with a clear limitation:

This section applies to adjustments of the dollar amount stated in the Contract as the Maximum Unit Rent. It does not apply to adjustments in rents payable to Owners as required by HUD in connection with its mortgage insurance and/or lending functions.

Maximum units rents are merely a ceiling above which contract rents may not rise. In this case, contract rents apparently never reached the existing ceiling. Therefore, whether HUD failed to apply automatic adjustment factors to raise maximum unit rents is irrelevant.

Furthermore, it was uncontroverted that local HUD officials were advised by their counsel not to give AAF increases in contract rents to any project receiving Section 8 subsidies under the loan management set-aside program. They apparently have never done so. Instead, HUD's policy is to grant contract rent increases only to permit an owner to meet documented increases in operating costs.

Even if the rent increase and flexible subsidy denials were reviewable, the record amply supports HUD's decisions. HUD's insured project servicing handbook generally states that rent increases should only be granted when increased expenses can be specifically anticipated, when the project is being well maintained or the owner agrees to take action to meet minimum standards set by HUD, and when project management is competent. (Defendants' Exhibits 95, pp. 2–7).

With these factors in mind, HUD officials justifiably denied rent increases. First, the department's on-site inspections beginning in November, 1978 (Findings of Fact, paragraphs 34–35, 38, 50), the comprehensive management reviews conducted in late May and early June, 1980 (Findings of Fact, paragraphs 69–72), and again in June and July, 1981 (Findings of Fact, paragraphs 105, 109), as well as HUD's 1980 financial audit (Findings of Fact, paragraphs 75–76) more than adequately support HUD's conclusion that LEOUT was not an effective manager.

Second, the fact that HUD granted annual contract rent increases for three years after the initial mortgage default undercuts plaintiffs' claim of arbitrariness. *United States v. Hartford Green Associates*, Civil No. H 82–707, slip op. at 4 (D.Conn. August 23, 1983).

Finally, the spectre of a continual and accelerating mortgage default justifiably colored HUD's decisions.

Little Earth was one of only five HUD-subsidized section 236 or 221(d)(3) housing projects within the State of Minnesota denied rent increases at any time, and alone among those five in not receiving subsequent rent increase. This, however, does not establish that HUD acted arbitrarily and capriciously in denying the increases. The significance of the comparisons with other projects is lessened by the fact that there is no evidence as to which, if any, of the projects had HUD-held mortgages; had been in default since 1975; had inadequately fulfilled section 8 bookkeeping obligations; received adverse audit findings; or were managed by a non-profit corporation through its board of directors without the on-site assistance of a professional management agent. Obviously, all of these factors were critical in HUD's decision to refuse rent increases and budget approvals.

In contrast to the ample justification for HUD's substantive rent increase decisions, HUD's inexplicable failure to timely inform LEOUT of rent increase denials and failure to approve or deny annual budgets, is simply inexcusable. The record clearly shows that in April, 1980, local HUD officials decided to delay action on all pending rent increase and budget requests until completion of HUD management reviews and audits. This decision was not communicated to the LEOUT board.

Similarly, by September, 1980, local officials determined that any project rent increases were unjustified because of management problems. Again, this decision was never conveyed to the LEOUT board. As a result, three annual rent increase requests and annual budgets awaited approval or denial.

Indeed, it was not until September 25, 1981, that HUD first responded in writing to LEOUT's pending rent increase and budget approval requests. This procedural capriciousness was clearly arbitrary and an abuse of discretion. Moreover it was a clear violation of procedures required by HUD's own Insured Project Servicing Handbook.

Although the action is deplorable, it is no defense to foreclosure. This is especially true where the substantive decisions about which HUD failed to communicate, are themselves justified by the record. Moreover, HUD's handbook requiring a written response to rent increases within thirty (30) days has "no binding force" on the agency. *U.S. v. Thomas*, 627 F.Supp. 129 (N.D.Ill. 1985). In any event, at this late stage, the Court is simply unable to fashion a remedy for this particular type of administrative abuse.

With respect to flexible subsidy funding, the area office did not, as plaintiffs allege, improperly divert flexible subsidy funds belonging to Little Earth to other projects. While local offices ask for funds to be used at particular projects, the offices are not required to give the money to particular projects. (Defendants' Exhibit 120). In this case, HUD made a determination that Little Earth's management problems made the project ineligible for funding. This decision, as discussed above, is supported by the record. The local office would have lost any funds not under contract by the June 30 deadline, so the office gave money to those projects that qualified.

The Court heard extensive testimony regarding the award of flexible subsidy funding to Cedar Square West. Like Little Earth, Cedar Square West was clearly a troubled project with a long and complex history. On the present record, however, the Court simply cannot conclude that award of flexible subsidy funding to Cedar Square West compels the conclusion that HUD arbitrarily denied such funding to Little Earth.

B. *Post-foreclosure Administrative Decisions*

█ To the extent judicial review is available relative to HUD's foreclosure decision, it surely does not reach actions of the parties to resolve their dispute once HUD began advertising the nonjudicial foreclosure sale in mid-March, 1982. At such point, "any further business judgments made by HUD in its continued prosecution of the foreclosure action are immaterial and collateral to HUD's decision to foreclose, and therefore, wholly discretionary." *United States v. OCCI, Co.*, 758 F.2d 1160, 1165 (7th Cir.1985).[3] In fact, based on Fed.R.Evid. 408, the Seventh Circuit calls into question the very admissibility of evidence concerning HUD's processing and consideration of the TPA proposal, made as it was, after HUD initiated foreclosure proceedings. *United States v. OCCI*, 758 F.2d at 1165 n. 6 (since consideration of such proposals "can be broadly described as efforts to reach and secure a settlement ... on the foreclosure action, the admissibility of such facts is questionable.")

Thus, LEOUT's focus on allegedly arbitrary acts by HUD during 1982 negotiations to forestall foreclosure, or HUD's 1983 rejection of the TPA are immaterial to HUD's right to go forward with foreclosure.

█ Moreover, even, if such decisions were relevant and reviewable, the Court would not necessarily condemm them. For example, plaintiffs emphasize that HUD officials failed to review LEOUT's comprehensive July 27 management proposal, and

---

**3.** That *OCCI* involved judicial foreclosure, and the instant case initially involved only non-judicial foreclosure, is a distinction without significance. Regardless of the type of foreclosure proceeding, business judgments made by HUD in its continued prosecution of the action are collateral to HUD's decision to foreclose.

further complain that HUD's July 28th ultimatum contained demands that were impossible of performance within two weeks.

There is no dispute that HUD officials failed to review the extensive July 27th proposal. Findings of Fact, paragraphs 174–176. Nor can it be disputed that the two week deadline was, on its face, unrealistic.

In the context of events preceding July 28th, however, HUD's failure to review the proposal, and the demands of July 28th, were not irrational or unreasonable. HUD informed LEOUT that foreclosure was imminent as early as September, 1981. In the intervening ten months, extended discussions had taken place regarding syndication options. LEOUT repeatedly represented to HUD that the board was actively negotiating a transfer that would avoid foreclosure. HUD exercised forbearance by granting two extensions of the advertised foreclosure sale.

What was impossible of execution in July, 1982 was not necessarily impossible of execution months earlier. For example, Mayor Fraser conceded on cross examination that city cooperation would have been more likely to have been arranged if LEOUT had requested assistance in October, 1981, instead of waiting until July, 1982. By July, 1982, HUD was entitled to step in and essentially say "no more."

In this case, as in *United States v. OCCI*, the 1983 TPA proposal was presented for approval after foreclosure proceedings were commenced. Accordingly, HUD's consideration of the proposal should be insulated from judicial review. To hold otherwise would "afford the defaulting mortgagor an opportunity to resist foreclosure by seeking review of the efforts taken by the parties during the course of litigation in attempting to cure the default and resolve related fiscal problems thereby prolonging the foreclosure proceedings." *OCCI* at 1165.

Plaintiffs place great weight on John Cann's testimony that the rejected TPA would generate more funds than the planned mortgage foreclosure and sale. Even if this were true, it is not a defense to foreclosure. *OCCI*, 758 F.2d at 1164 n. 4 ("[e]qually immaterial to the resolution of the instant foreclosure action is OCCI's assertion that, in hindsight, the Johnson/Schuman proposal was the better alternative.")

Moreover, Donald Myers testified without contradiction that a comparison of the agency's financial return if it accepted a syndication proposal with HUD's financial return upon foreclosure and resale was not normally made during HUD TPA reviews. In addition, even Cann conceded that the proposed TPA would not meet the project's immediate capital needs. On such a record, the Court is loathe to conclude that HUD acted irrationally in rejecting the proposal.

Equally unconvincing is plaintiffs' assertion that HUD's failure to contribute financially to a work out agreement was arbitrary and capricious and contrary to normal HUD procedures. Steven Parliment testified that such HUD participation was a common element in syndication. As noted in the Findings of Fact, however, the Court is not particularly impressed with his testimony in that he had been involved with only a limited number of TPA's. Moreover, he was unable to provide detailed information as to whether other projects he had worked on were similarly situated to Little Earth. Without such information, the Court cannot conclude that HUD acted unreasonably.

## II. Civil Rights Claims

### A. Scope of Review

The parties raise a threshold question concerning the appropriate standard of review for plaintiffs' civil rights claims. Defendants contend that because the Administrative Procedures Act ("APA") provides the only applicable waiver of sovereign immunity, the APA mandates that the standard of review is a "narrow one [under which] ... [t]he court is not empowered to substitute its judgment for that of the agency," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). Generally, "the focal point for judicial review should

be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

This limited scope of review is clearly applicable to plaintiffs' Title VIII claim. 584 F.Supp. at 1296, citing *Client's Counsel v. Pierce*, 711 F.2d 1406, 1425 (8th Cir. 1983). *See also NAACP v. Secretary of Housing*, 817 F.2d 149, 157 (1st Cir.1987).

The same limited scope of review is statutorily mandated under Title VI. As noted previously by this Court:

> Federal agencies are required by section 602, 42 U.S.C. § 2000d–1 to enforce section 601. Under section 602, each agency must issue rules and regulations consistent with the objectives of section 601 and effect compliance by (1) termination of or refusal to grant funding assistance, or (2) any other means provided by law. Section 603, 42 U.S.C. § 2000d–2, authorizes judicial review of agency actions taken pursuant to section 602 "in accordance with section 10 of the Administrative Procedure Act." A case can be remanded to HUD for further administrative proceedings if the agency's actions are found to be irrational, unsupported by the record, or an abuse of discretion.

584 F.Supp. 1297, *citing Adams v. Richardson*, 480 F.2d 1159, 1163 (D.C.Cir.1973). *See also NAACP v. Wilmington Medical Center, Inc.*, 453 F.Supp. 280, 295 (D.Del. 1978) ("the language of section 603 contemplates not an independent cause of action in federal court but an intermediate level of judicial review to determine the propriety of an agency action or proceeding.")[4]

But no authority squarely holds that agency action allegedly violative of the Fifth Amendment, 42 U.S.C. § 1981, 42 U.S.C. § 1982 or 42 U.S.C. § 1985(3) is reviewable only under the APA. This Court implicitly rejected just such a conclusion by holding that the appropriate waiver of sovereign immunity is available under *Larson v. Domestic & Foreign Commerce*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) and its progeny. 584 F.Supp. at 1300. Where, as here, the question presented is whether defendants violated plaintiffs' constitutional and statutory rights, not whether defendants acted reasonably or unreasonably, judicial deference to agency decisions is not required. Thus, with regard to plaintiffs' Fifth Amendment, 42 U.S.C. § 1981, 42 U.S.C. § 1982 and 42 U.S.C. § 1985(3) claims, the Court has examined the agency's actions de novo, including consideration of evidence not in the administrative record.

**B.** *Claims Requiring Proof of Discriminatory Intent*

■ As this court previously noted, to establish a Fifth Amendment due process violation, plaintiffs must prove that HUD officials acted with a discriminatory purpose. *Personnel Administrator v. Feeney*, 442 U.S. 256, 272–81, 99 S.Ct. 2282, 2292–97, 60 L.Ed.2d 870 (1979); *Client's Council v. Pierce*, 711 F.2d 1406, 1409 (8th Cir.1983). The same is true for plaintiffs' cause of action under 42 U.S.C. § 1981, *General Building Contractors Assn. v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Taylor v. City of St. Louis*, 702 F.2d 695, 697 (8th Cir.1983), as well as 42 U.S.C. § 1985(3). *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); *Taylor*, 702 F.2d at 697.

Although the Supreme Court is deeply divided on the issue, seven members of the Court agree that a violation of Title VI also requires a showing of discriminatory intent. *Guardians Association v. Civil Service Commission of the City of New York*,

---

4. Notwithstanding the conclusion that the APA provides the standard of review for plaintiffs' Title VI and Title VIII claims, the Court has considered evidence outside of the administrative record, including the testimony of witnesses John Cann, Steven Parliment, Donald Fraser, Karen Clark, Juanita Espinoza, Donna Folstad and Tony Scallon. Where, as here, HUD's bad faith or improper motivation is so prominently at issue, such evidence seems particularly appropriate. *See NAACP v. Wilmington Medical Center, Inc.*, 453 F.Supp. at 306. In any event, restricting the record would only weaken plaintiffs' case, making even stronger the Court's decision in favor of defendants.

463 U.S. 582, 609 n. 1, 103 S.Ct. 3221, 3235 n. 1, 77 L.Ed.2d 866 (1983). *See also Latinos Unidos de Chelsea v. Secretary of Housing*, 799 F.2d 774, 783 (1st Cir.1986).[5]

Determining whether such discriminatory intent is present requires a "sensitive inquiry" into the "totality of the relevant facts." *Client's Council v. Pierce*, 711 F.2d at 1409. Factors which the court should explore include not only the effect of the challenged decisions, but the "historical background, the sequence of events leading up to the challenged decisions, the departures from the normal procedural sequence, the substantive departures from the norm, and the alternatives that were available." *Id.* at 1409.

The overall inquiry "is a practical one which is designed to determine whether the decisionmaker's actions ... could not 'reasonably be explained without reference to racial concerns.'" *Id.*, quoting *Columbus Board of Education v. Penick*, 443 U.S. 449, 461, 99 S.Ct. 2941, 2948, 61 L.Ed.2d 666 (1979).

After careful review, the Court concludes that HUD's actions were taken without discriminatory intent. Simply stated, the evidence at trial proves that HUD justifiably seeks foreclosure on the Little Earth mortgage because LEOUT failed to carry out its responsibilities under its contracts signed with HUD. There is no question but that HUD sought to divest Little Earth from control by a board of directors whose members were predominantly American Indian. But it was the board's ineffective project management, not racial composition, that forced HUD's decision. The fact that LEOUT is an organization controlled by American Indians does not entitle LEOUT to breach its contracts.

As with the administrative action claims discussed above, plaintiffs' civil rights allegations are dramatically weakened by the fact that they allegedly occurred while HUD exercised considerable forbearance in delaying foreclosure and holding the project's mortgage in default for seven years. It is undisputed that HUD generously funded the project in 1976, 1977 and 1978, notwithstanding its unremedied mortgage default.

HUD had no statutory, regulatory or contractual duty to grant additional contract rent increases or award flexible subsidy funding. The agency's refusal to do so is easily justified without reference to racial factors. As noted above, HUD's on-site inspections, management reviews and financial audits documented continuing project mismanagement. HUD communicated its concerns to the LEOUT board both in writing and at meetings. The board's failure to adequately correct ongoing, and in some cases, worsening problems, provide ample support for HUD's decisions.

HUD's exceptional demand for a change of project control, first expressed in local director Feeney's January 15, 1981 letter and restated in the June 28, 1982 HUD ultimatum, invites judicial scrutiny. The wording of the June 28th letter in particular is disturbing because read literally, it suggests HUD requires a transfer of control to a non-Indian majority. After considering all of the testimony, however, the Court is convinced that the letter was intended as a demand for transfer of the project to a business-oriented or profession-

---

**5.** This Court previously relied on *Taylor v. City of St. Louis*, 702 F.2d 695 (8th Cir.1983) for the proposition that proof of discriminatory intent is also required to establish a breach of 42 U.S.C. § 1982. This may be the case, but *Taylor* does not so hold. Although the Supreme Court has avoided deciding the matter on at least one occasion, *City of Memphis v. Greene*, 451 U.S. 100, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981), Justice Rehnquist's decision in *General Building Contractors Association*, 458 U.S. 375, 102 S.Ct. 3141, strongly suggests that a finding of discriminatory purpose is a prerequisite to a successful section 1982 claim.

This Court declines to decide such a complicated and much debated question. Although plaintiffs maintain that discriminatory intent is not required, they concede that the Court should consider racial motivation. Plaintiffs' Post–Trial Memorandum at pg. 12. On the present record, the Court cannot conclude that HUD's treatment of LEOUT and Little Earth residents was in any way impermissibly attributable to race. The Court therefore denies plaintiffs' section 1982 claim.

al majority, not to a non-Indian majority. This demand, like the denial of rent increases and flexible subsidy monies, is justifiable without reference to racial factors, based on documented project mismanagement.

Thomas LaSalle's January, 1981 resignation as LEOUT's outside management consultant bolsters this conclusion. LaSalle testified that it became increasingly difficult to work with the LEOUT board. Similarly, Westminster Corporation, the project's receiver, initially declined to assume management responsibilities after concluding that LEOUT was unable to delegate sufficient management authority to an independent agent and still meet its objectives of self-determination for the project and its residents.

Between 1978 and 1981, HUD employees worked diligently with project managers and the board to remedy contract compliance deficiencies. Yet HUD's on-site inspections, management reviews and financial audits depict a project in continuing default without prospect for significant improvement.

The Court is unimpressed by plaintiffs' statistical evidence purportedly establishing that LEOUT was singled out for adverse action. The comparisons have little relevance absent critical information regarding each project's financial management, mortgage history and physical condition. Little Earth was indeed alone among HUD sponsored projects in Minnesota by being denied rent increases. But this Court concludes that the project's poor physical and financial condition was sufficient justification for exceptional HUD action independent of racial factors.

The Court also rejects plaintiffs' contention that HUD's rigid bookkeeping and Section 8 recertification requirements establish that the agency targeted the project for adverse treatment solely because of race. Plaintiffs did introduce evidence showing that bookkeeping requirements were less rigid at two other projects. Neither of those projects, however, had the rapid client turnover characteristic at Little Earth. Moreover, neither was in default

and, therefore, justifiably subject to close HUD supervision.

Plaintiffs further suggest that purportedly counterfeit documents including the 1981 counterpart contract and the January, 1981 version of HUD's management review report, show HUD's discriminatory intent. The Court cannot accept the inference of racial discrimination. It simply disagrees with plaintiffs' characterization of the documents. *See* Findings of Fact, paragraphs 76, 102.

Plaintiffs also would have the Court find proof of discriminatory intent in HUD's failure to conduct displacement analysis or to impose use restrictions at foreclosure. As more fully discussed below in the context of plaintiffs' Title VIII claim, these conclusions make little sense where the weight of the evidence shows that HUD officials neither intended nor expected displacement. Moreover, as noted in the Findings of Fact at paragraph 149, Congress saw fit to give the Secretary discretion as to the appropriateness of imposing use restrictions at foreclosure. The Secretary did not abuse his discretion in this case. His failure to impose use restrictions is not proof of discriminatory intent.

Finally, the Court finds no proof of discriminatory intent in HUD's rejection of the 1983 TPA, or in the agency's rejection of a settlement. As discussed above, HUD was under no obligation to accept a particular TPA proposal. HUD desired a transfer of control before committing significant resources to the project, a demand this Court believes was reasonable under the circumstances. The TPA did not accomplish this result.

Evidence introduced relative to collapse of settlement discussions was inconclusive. It is not clear from the record precisely why HUD decided not to settle this lawsuit. Assuming racial discrimination was a factor, however, is sheer speculation.

C. *Title VIII of the Civil Rights Act of 1968*

In contrast to plaintiffs' other civil rights claims, plaintiffs need not establish dis-

criminatory intent to prevail on their claim pursuant to Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 *et seq.*

■ Under section 3608(d)(5), the Secretary of HUD has an affirmative duty to administer housing and urban development programs in a manner that will further the policies of fair housing. To find a breach of that duty, plaintiffs need not establish a constitutional violation. *Client's Council v. Pierce*, 711 F.2d at 1425. All that is required is proof that HUD failed to carry out its affirmative duty to " 'institute action the direct result of which was to be the implementation of the dual and mutual goals of fair housing and the elimination of discrimination in that housing.' " *Id.* at 1425, *citing Banks v. Perk*, 341 F.Supp. 1175, 1182 (N.D.Ohio 1972), *aff'd in part, rev'd in part on other grounds*, 473 F.2d 910 (6th Cir.1973).

■ This Court's review of the Secretary's actions under Title VIII is narrow. HUD has great discretion is choosing methods to achieve national housing goals, and its actions will be overturned only if found to be arbitrary and capricious within the meaning of Section 706(2)(A) of the APA, 5 U.S.C. § 706(2)(A). 584 F.Supp. 1297.

The Court need not second guess each and every agency decision which plaintiffs contend had an unjustified discriminatory effect on Little Earth's Indian tenants. Rather, the Court should conduct "a more straight forward evaluation of whether agency activity over time has furthered the statutory goal, and, if not, [call] for an explanation of why not and a determination of whether a given explanation, in light of the statute, is satisfactory." *NAACP v. HUD*, 817 F.2d at 158.

At the heart of plaintiffs' Title VIII claim is that HUD, without proper analysis and concern, embarked on a course of action culminating in a foreclosure decision which risks displacement of Little Earth's Indian tenants. The chimera of displacement is simply insufficient to compel a verdict in plaintiffs' favor.

Significant and compelling evidence indeed demonstrates that the Little Earth housing project is the focal point of the American Indian community in the Twin Cities. The evidence does not, however, establish that foreclosure is synonymous with displacement in the Indian community.

Instead, the weight of the evidence shows that HUD officials fully intended and expected their 90% foreclosure bid to prevail. Once acquiring title, HUD's further actions will be governed by 24 C.F.R. Part 290, "Management and Disposition of HUD–Owned Multi-Family Housing Projects" which call for precisely the detailed displacement analysis plaintiffs urge. Requiring the same analysis prior to HUD's acquisition of title would, on the facts of this case, seem premature and unnecessary.

Indeed HUD's disposition plans after purchase call for sale of the project with a Section 8 contract to subsidize 100% of the units for 15 years from the sale date. Defendant's counsel repeatedly represented to the Court that this remains HUD's plan. Should such promises be kept, as the Court fully expects they will be, the possibility of displacement is remote indeed. In light of the fact that the existing Section 8 contract terminates in 1992, it appears to the Court that foreclosure may actually provide the best long-term protection against displacement.

It cannot be overemphasized that the Court's conclusions today turn heavily on HUD's representations that it will bid successfully for the project, and generously subsidize it after purchase to avoid displacement of low income tenants. This Court will, and any other Court called to review the issue should, put HUD to an extremely heavy burden to justify subsequent actions inconsistent with HUD's representations.

■ This Court cannot accept HUD's failure to impose low- and moderate-income use restrictions upon foreclosure, as permitted by the Multifamily Foreclosure Act (the "Act"), 12 U.S.C. §§ 3701 *et seq.*, to be, by itself, a Title VIII violation. Congress saw fit to give the Secretary discretion to foreclose in accordance with the Act, or, instead, to use any other foreclosure proce-

dures available. 12 U.S.C. § 3703. Congress further directed that the Secretary was free, at his discretion, to impose low- and moderate-income use restrictions in non-Act proceedings. *Id.* In light of HUD's expectations that its bid will prevail at foreclosure, the Court finds no abuse of discretion in the Secretary's failure to impose use restrictions.

Nor does the Court find fault with the overall pattern of HUD's pre-foreclosure decisions. As detailed in the Court's Findings of Fact and preceding portions of this memorandum, the decisions, for the most part, were fully justified. To the extent HUD acted arbitrarily, for example by failing to follow the requirements of its handbook relative to rent increase denials, the error is simply insfficient as a basis to condemn the overall pattern of HUD's decisions.

### D. *Trust Doctrine*

██ Plaintiffs argue that HUD's affirmative obligations are heightened by the long recognized trust relationship between the federal government and American Indians. This trust relationship creates a fiduciary obligation on the part of the United States government, including its various agencies, to act in the best interests of the American Indian people generally. *United States v. Mason,* 412 U.S. 391, 399, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973).

██ The trust relationship extends not only to Indian Tribes as governmental units, but to tribal members living collectively or individually, on or off the reservation. *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *St. Paul Intertribal Housing Board v. Reynolds,* 564 F.Supp. 1408, 1413–14 (D.Minn. 1983). Thus, the fact that HUD did not consider Little Earth specialized Indian housing does not make the trust doctrine per se inapplicable. HUD officials obviously identified Little Earth as an Indian project. From its inception, it was intended to, and does serve primarily American Indians.

██ Plaintiffs urge that the trust doctrine requires HUD to affirmatively en-

courage urban Indian housing rather than dismantle it where it exists. The Court generally agrees. But here, HUD did encourage the project by waiting more than seven years after the project's initial default to exercise its clear statutory and contractual right of foreclosure. Surely, HUD's trust obligations do not dictate continued financing of a demonstrably mismanaged and failing project.

Plaintiffs find specific breaches of HUD's trust obligations in the agency's failure to thoroughly study the potential displacement resulting from its foreclosure decision, and further by HUD's failure to analyze how, and if, replacement may occur of the cultural support, social benefits and community services for American indians which Little Earth provides. Little Earth indeed provides significantly more to the American Indian community than simply additional low income housing units. Findings of Fact, paragraphs 135–139. HUD did not assess how foreclosure would effect the continued provision of such services. At the same time, no evidence was introduced to establish the inevitable loss of such services after foreclosure.

In any event, these arguments must be dismissed for the same reasons the Court finds fault with plaintiffs' Title VIII claim. The weight of the evidence suggests that HUD will be the successful purchaser upon foreclosure. Displacement will not occur. HUD's existing post-acquisition disposition regulations require precisely the type of analysis plaintiffs urge. Should such analysis not occur after foreclosure, plaintiffs may have a cause of action. At this point, assertion of trust obligations is premature.

### III. *Contract Claims*

██ Plaintiffs present three claims sounding in contract. First, plaintiffs contend defendants breached the section 8 contracts by failing to give the project requested rent increases and/or applying automatic adjustment factors so as to annually raise contract rents. By Order dated Janu-

ary 17, 1987, this Court dismissed the claim for lack of subject matter jurisdiction.

Even assuming the Court has jurisdiction to hear the claim, it would be dismissed. No statute, regulation or contract term mandates favorable decisions on requested annual rent increases. Said decisions are subject to the unreviewable discretion of the Secretary. Even if reviewable, HUD's rent decisions here were not arbitrary and capricious. Furthermore, as noted above, HUD never applied automatic adjustment factors to increase contract rents under the Section 8 loan set-aside program. There is no statutory, regulatory or contractual requirement to do so. Accordingly, there was no breach of contract.

■ Second, plaintiffs contend that defendant breached the interest reduction contract. This recoupment claim was dismissed by summary judgment in January, 1987, based on the uncontroverted affidavit of Peggy A. Grant, an official in HUD's Office of Finance and Accounting. In the affidavit, Ms. Grant stated that all interest reduction payments due on the project since June 1975 had been paid. No evidence to the contrary was introduced at trial.

LEOUT has a loan payable at 7% and receives monthly interest reduction payments in an amount equal to

the difference between the monthly payments for principal, interest, and mortgage insurance premiums which the project owner ... is obligated to pay under the mortgage and the monthly payment of principal and interest such project owner would be obligated to pay if the mortgage were to bear interest at a rate of 1% per annum.

12 U.S.C. § 1715z–1a. *See also* 24 C.F.R. § 236.520(a).

These payments reduce the interest rate payable by the mortgagor over the life of the loan to the equivalent of 1%. But receipt of such payments by no means transforms LEOUT's 7% loan into a 1% loan.

Accordingly, the Court rejects plaintiffs' request to amend defendant's counterclaim

to reduce the amount of interest sought by the Secretary on the unpaid balance of the loan from 7% to 1%, or to strike the Secretary's demand for interest entirely. Plaintiffs' alternative request to strike all testimony heard at trial which is at variance with the conclusion that the interest rate on the loan has been reduced to 1% must also be denied.

■ Finally, plaintiffs argue that HUD's rejection of the September, 1983 memorandum of understanding for a Transfer of Physical Assets ("TPA") with Real Property Services Corporation ("RPSC") was a breach of trust or "quasi-contract." Supplemental Complaint, paragraph XIII.

This gist of this claim is that plaintiffs, acting in reliance upon HUD representations as to the requirements for an acceptable TPA, negotiated an agreement with RPSC, that, but for HUD's rejection, would have gone forward resulting in the infusion of much needed money for the project. Plaintiffs ask the Court to enter an injunction prohibiting HUD from interfering with the plaintiffs' efforts to arrange syndication.

It is not entirely clear to the Court that plaintiffs actually intended by their Supplementary Complaint to plead a contract claim separate and distinct from their APA and civil rights claims. Assuming they did, the Court must deny the claim.

"Quasi contracts" are contracts created by law on grounds that they are dictated by reason and justice. *Dunn v. Phoenix Village, Inc.*, 213 F.Supp. 936, 951–52 (W.D.Ark.1963). A quasi-contractual obligation is best analogized to the duty to make restitution. *Bloomgarden v. Coyer*, 479 F.2d 201, 208–09 (D.C.1973). As a practical matter, the doctrine is most applicable in cases involving unjust enrichment. *United States v. O. Frank Heinz Construction Co.*, 300 F.Supp. 396, 400 (S.D.Ill. 1969) ("the only essential element for quasi-contract is the receipt of a benefit which it would be inequitable to retain"). Application of the doctrine to the case at bar is tenuous at best.

Here, plaintiffs' claim fails for the simple reason that HUD promised no more than that they would seriously consider a TPA proposal including an initial contribution of between $1.25 and 1.5 million. HUD officials mentioned the possibility of, but did not promise, utilization of supplemental funding options to facilitate a syndication transaction and project rehabilitation. On such a record, reason and justice does not demand that HUD be held to a promise to accept a particular TPA.

## IV. *Counterclaim for Judicial Foreclosure*

By Order dated June 27, 1983, this Court held that the project mortgage had been in default since 1975, that HUD has a clear contractual and statutory right to foreclose and that HUD's decision to foreclose was neither arbitrary nor capricious. The Court reaffirms those conclusions today. Additionally, as noted above, the Court rejects plaintiffs' civil rights claims.

In light of these decisions, the Court has no choice but to grant HUD's counterclaim for judicial foreclosure. As noted in the Findings of Fact, the accelerated mortgage debt as of February 12, 1987, with interest, totalled $6,791,721.81.

The parties hotly contest the propriety of adding the expenses of the receivership to the mortgage debt. Said expenses include advances for taxes, operating expenses, as well as substantial project rehabilitation.

The Court's November 8, 1983 Order specified in detail the duties and authority of the project receiver and directed that HUD advance funds to cover project rehabilitation.

That HUD requested appointment of the receiver does not automatically render HUD responsible for the receiver's costs. *Little Earth v. HUD.,* 807 F.2d 1433, 1442 (8th Cir.1986). But that conclusion is appropriate here.

The Court has wide discretion to determine who shall bear the costs of receivership. *Id., citing Atlantic Trust Co. v. Chapman,* 208 U.S. 360, 370–75, 28 S.Ct.

406, 408–11, 52 L.Ed. 528 (1908); *Bowersock Mills & Power Co. v. Joyce,* 101 F.2d 1000, 1002 (8th Cir.1939). The normal rule is to assess the costs and expenses of the receivership against the property which is subject to the receivership. *Id.*

HUD suggests it is entitled to add the receivership expenses to the mortgage debt so as not to foreclose the agency's opportunity to collect said monies out of the foreclosure sale proceeds. The argument has little merit, particularly in light of HUD's vigorous assertions that its own 90% bid will almost certainly prevail.

Moreover, the Court is impressed by plaintiffs' argument that, at least to some extent, HUD controls the receiver's income by determining the Section 8 contract rent levels. By setting the rents at a level insufficient to cover operating expenses, and principal, interest, taxes and insurance payment, HUD effectively has deferred substantial Section 8 expenditures by charging them to Little Earth's mortgage debt.

In the face of such a large accelerated debt, whether LEOUT retains a right of redemption is purely theoretical. Nonetheless, it is well established that LEOUT has no right to redeem the property after foreclosure sale. The state statutory right of redemption, 37 Minn.Stat. §§ 580.23, 581.10, is not applicable to foreclosure of federally held or insured loans under the National Housing Act. *United States v. Victory Highway Village,* 662 F.2d at 498. Under federal law, there is no statutory right of redemption after foreclosure. *Id.*

One last point deserves mention. Both parties have previously indicated they will likely appeal from any adverse decision. Should timely appeal be filed, the Court will look favorably upon motions to continue the injunction and receivership in full force and effect for the reasons articulated in this Court's August 19, 1983 Order. 584 F.Supp. 1301.